Rebecca K. Smith
Public Interest Defense Center, P.C.
P.O. Box 7584
Missoula, MT 59807
(406) 531-8133
publicdefense@gmail.com

Timothy M. Bechtold
Bechtold Law Firm, PLLC
P.O. Box 7051
Missoula, MT 59807
(406) 721-1435
tim@bechtoldlaw.net

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| ALLIANCE FOR THE WILD ROCKIES, NATIVE ECOSYSTEMS COUNCIL, <br><br>      Plaintiffs, <br><br> vs. <br><br> MATT ANDERSON, Supervisor, Bitterroot National Forest; LEANNE MARTEN, Regional Forester, U.S. Forest Service Northern Region; U.S. FOREST SERVICE, <br><br>      Defendants. | CV-24- <br><br> COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF |

## I.  INTRODUCTION

1.    This is a civil action for judicial review under the Administrative Procedure Act of the U.S. Forest Service's authorization of the Gold Butterfly Project and associated Forest Plan Amendments (collectively Project) on the Bitterroot National Forest (Forest).

2.    Plaintiffs attest that the decision approving the Project is arbitrary and capricious, an abuse of discretion, and/or otherwise not in accordance with law.

3.    Defendants' approval of the Project violates the National Environmental Policy Act (NEPA), 42 U.S.C. §4331 et seq., the National Forest Management Act (NFMA), 16 U.S.C. §1600 et seq., the Healthy Forest Restoration Act, 16 U.S.C. §6591 et seq, and the Administrative Procedure Act (APA), 5 U.S.C. §§ 701 et seq.

4.    Plaintiffs seek a declaratory judgment, injunctive relief, the award of costs, and expenses of suit, including attorney and expert witness fees pursuant to the Equal Access to Justice Act, 28 U.S.C. §2412, and/or such other relief as this Court deems just and proper.

## II. JURISDICTION

5.    This action arises under the laws of the United States and involves the United States as a Defendant. Therefore, this Court has subject matter

jurisdiction over the claims specified in this Complaint pursuant to 28 U.S.C. §§ 1331, 1346.

6. An actual controversy exists between Plaintiffs and Defendants. Plaintiffs' members use and enjoy the Forest for hiking, fishing, hunting, camping, photographing scenery and wildlife, and engaging in other vocational, scientific, spiritual, and recreational activities. Plaintiffs' members intend to continue to use and enjoy the area frequently and on an ongoing basis in the future.

7. The aesthetic, recreational, scientific, spiritual, and educational interests of Plaintiffs' members have been and will be adversely affected and irreparably injured if Defendants implement the Project. These are actual, concrete injuries caused by Defendants' failure to comply with mandatory duties under NFMA, NEPA, HFRA, and the APA. The requested relief would redress these injuries and this Court has the authority to grant Plaintiffs' requested relief under 28 U.S.C. §§ 2201 & 2202, 5 U.S.C. §§ 705 & 706, and 16 U.S.C. §1540.

8. Plaintiffs fully participated in the available administrative review processes for the Project; thus they have exhausted administrative remedies. The Court therefore has jurisdiction to review Plaintiffs' APA claims.

## III. VENUE

9.     Venue in this case is proper under 28 U.S.C. §1391(e) and Local Rule

3.2(b).  Defendant Anderson resides in Ravalli County, which is within the

Missoula Division of the United States District Court for the District of

Montana.

## IV. PARTIES

10.    Plaintiff ALLIANCE FOR THE WILD ROCKIES is a tax-exempt,

non-profit public interest organization dedicated to the protection and

preservation of the native biodiversity of the Northern Rockies Bioregion,

its native plant, fish, and animal life, and its naturally functioning

ecosystems. Its registered office is located in Missoula, Montana. The

Alliance has over 2,000 individual members, many of whom are located in

Montana. Members of the Alliance observe, enjoy, and appreciate

Montana's native wildlife, water quality, and terrestrial habitat quality, and

expect to continue to do so in the future, including in the Project area.

Alliance's members' professional and recreational activities are directly

affected by Defendants' failure to perform their lawful duty to protect and

conserve these ecosystems.  Alliance for the Wild Rockies brings this action

on its own behalf and on behalf of its adversely affected members.

11.    Plaintiff NATIVE ECOSYSTEMS COUNCIL is a non-profit Montana

corporation with its principal place of business in Three Forks, Montana. Native Ecosystems Council is dedicated to the conservation of natural resources on public lands in the Northern Rockies. Its members use and will continue to use the Forest for work and for outdoor recreation of all kinds, including fishing, hunting, hiking, horseback riding, and cross-country skiing. The Forest Service's unlawful actions adversely affect Native Ecosystems Council's organizational interests, as well as its members' use and enjoyment of the Forest, including the Project area. Native Ecosystems Council brings this action on its own behalf and on behalf of its adversely affected members.

12.    Defendant MATT ANDERSON is the Forest Supervisor for the Bitterroot National Forest, and is the decision-maker who signed the Record of Decision approving the Project.

13.    Defendant LEANNE MARTEN is the Regional Forester for Region One/Northern Region of the U.S. Forest Service. Her office denied Plaintiffs' objections to the Project.

14.    Defendant UNITED STATES FOREST SERVICE (USFS) is an administrative agency within the U.S. Department of Agriculture, and is responsible for the lawful management of our National Forests, including the Bitterroot National Forest.

# V. FACTUAL ALLEGATIONS

## A. Project and Project Area

15.   The Gold Butterfly Project area includes 55,147 acres of National Forest System lands and is located within Ravalli County east of Corvallis, Montana in the Sapphire Mountains on the Bitterroot National Forest.

16.   The Project area includes a portion of the Stony Mountain Inventoried Roadless Area but no treatment activities will occur within the Inventoried Roadless Area or Wilderness or Research Natural Areas.

17.   The Project authorizes commercial logging on 5,281 acres, including clearcutting across wide swaths of forest.

18.   The Project also allows non-commercial tree-cutting and burning activities on an additional 2,084 acres.

19.   Project activities will require the transport of approximately 6,000-7,000 truckloads of wood products from the Project area.

20.   The Project also authorizes:

   a.   construction of 6.4 miles of new system road, decommissioning of 5.8 miles of system road, and addition of 16.5 miles of illegal non-system roads into the system, *for a net increase of 17.1 miles of permanent system roads*;

   b.   construction of 17.3 miles of temporary roads;

c.    closure of 21.5 miles of roads;

d.    conversion of 0.22 miles of road into a non-motorized trail;

e.    decommissioning of 16.5 miles of illegal, non-system road; and

f.    road maintenance/reconstruction on up to 80.1 miles of existing

roads.

21.    Temporary roads will be closed to public use by a closure order.

22.    Regarding illegal roads, also referred to as "undetermined" roads, which are

not lawfully on the Forest as part of the National Forest roads system but

nonetheless exist on the ground, the Gold Butterfly Project area has at least

33.1 miles of these illegal roads.

23.    The Forest Service estimates Project duration at eight years.

24.    The only economic analysis in the project record is the March 2, 2018

Economic Analysis, "ECON-001."

25.    ECON-101 discloses $1,572,054 anticipated in total revenue from the

Project.

26.    ECON-101 discloses the following costs from the Project:

| | |
|---|---|
| Sale Preparation | -$732,432 |
| Sale Administration | -$518,806 |
| Road BMP Upgrades | -$321,761 |
| Tree Planting | -$1,193,400 |
| Road Decommissioning | -$1,000 |
| Road Storage | -$2,995 |
| Meadow Restoration, Herbicide | -$1,000 |

| | |
|---|---|
| Meadow Restoration, Biocontrol | -$3,000 |
| Willow Trailhead Relocation | -$36,200 |
| Burnt Fork Trailhead Relocation | -$21,000 |
| Non-Commercial Thinning | -$78,995 |
| Non-Commercial Thinning, White Bark Pine | -$240,870 |
| Non-Commercial Thinning, Mechanical<br><br>Fuels Reduction | -$52,325 |
| Maintenance Burn | -$62,100 |
| Restoration Burn | -$521,600 |

| | |
|---|---|
| Brush Disposal – Purchaser | $72,933 |
| Brush Disposal – Forest Service | $715,809 |
| Erosion Control | $151,481 |
| Roadside Herbicide | $60,900 |
| Temporary Roads | $86,722 |
| Road Maintenance | $261,234 |
| Unusual Condition Adjustment** | $150,511 |
| Specified Roads -Construction | $381,739 |
| Specified Roads - Reconstruction | $102,782 |
| Road Decommissioning | $3,440 |
| Road Storage | $15,830 |

27.   These costs add up to $5,790,869, which means that the Forest Service

estimates that the Gold Butterfly Project will result in a net loss of $4.2

million to the federal taxpayer.

28.   The Project is likely to adversely affect bull trout, a species listed under the

Endangered Species Act.

29.   The Project is likely to adversely affect whitebark pine, a species listed

under the Endangered Species Act.  Commercial activities are proposed on

up to 3,082 acres of whitebark pine habitat. Commercial treatments could

damage or destroy some whitebark pine and whitebark pine trees could be cut due to misidentification. Prescribed fire could also destroy whitebark pine trees.

30.    Project activities would decrease hiding cover for wildlife on 6,100 acres through a combination of timber harvest, non-commercial thinning and/or prescribed burning.

**B.  Procedural Background**

31.    Scoping for the Project commenced on June 9, 2017.

32.    The draft EIS was issued in June 2018, and the Forest Service accepted public comment from June 15, 2018 to July 30, 2018.

33.    Over 100 individuals, including dozens of local residents, submitted comments on the draft EIS; the vast majority of commenters opposed the Project and requested a different alternative, including one comment letter signed by 3,000 members of the public.   In summary, the majority of the public requested an alternative with no old growth logging and no new roads.

34.    The final EIS and draft Record of Decision were issued in March 2019.

35.    The Forest Service held a pre-decisional administrative objection period from July 3, 2029 to August 8, 2019.

36.    19 objections were filed against the Project.

37.    On September 3, 2019, the Forest Service denied the objections.

38.    A revised final EIS was issued in October 2019.

39.    The final Record of Decision was issued on November 15, 2019.

40.    On July 10, 2020, litigation commenced in this Court against the Gold
Butterfly Project: *Friends of the Bitterroot v. Anderson*, CV-20-104-DLC
(*Gold Butterfly I*).

41.    After the lawsuit was filed, on August 28, 2020, the Forest Service formally
withdrew the Record of Decision in order to "conduct additional review and
analysis," and *Gold Butterfly I* was dismissed as moot.

42.    A public comment period on a draft supplemental EIS was held from June
25, 2021, to August 9, 2021.

43.    A final supplemental EIS and draft Record of Decision were released on
December 17, 2021, and initiated the 30-day administrative review
(objection) process.

44.    19 objections were filed against the Project between December 2021 and
January 2022.

45.    On February 16, 2022, all objections were denied.

46.    On February 2, 2023, the Forest Service issued a revised final supplemental
EIS.

47.    On August 8, 2023, the Forest Service issued the final Record of Decision

authorizing the Project.

## C.  Wildland Urban Interface Designation

48.    The Record of Decision states: "Most of the Gold Butterfly proposed action (6,640 acres of 7,365 acres total treatment area) would occur in a Designated Treatment Area per 16 USC 6591a(b)[.]"

49.    The Record of Decision states: "Approximately 57 percent of treated acres would occur within the Wildland-Urban Interface."

50.    The Final EIS for the Project implies that the "Bitterroot Community Wildfire Protection Plan (2006)" delineated the wildland urban interface used for the Project.

51.    However, there is no map in the EIS that clearly sets forth the wildland urban interface as defined by the 2006 Bitterroot Community Wildfire Protection Plan.

52.    Although a new wildland urban interface map was proposed in a 2009 update to the Bitterroot Community Wildfire Protection Plan, the Ravalli County Commissioners did not approve the newer 2009/2010 wildland urban interface map as described in a 2009 update to the Bitterroot Community Wildfire Protection Plan.  *See* "Will a twice-burned county change its ways?," High Country News (October 24, 2016); "County commissioners decline to act on WUI," Bitterroot Star (December 28,

2011); Ravalli County Commissioners' Meeting Minutes (December 20, 2011).

53.    The 2006/2007 Bitterroot Community Wildfire Protection Plan wildland urban interface is defined as follows: "For the purposes of the CWPP, the Wildland Urban Interface (WUI) is defined as the zone where structures or other human development meet to intermingle with undeveloped wildland or vegetative fuels. The width of the zone is determined on a site-specific basis to protect values at risk from wildland fire. At-Risk Communities are those communities identified and addressed in the CWPP that are considered at risk by wildland fire. At-Risk Communities, as defined in the Healthy Forest Restoration Act 2004, are comprised of: • An interface community as defined in the notice "Wildland Urban Interface Communities Within the Vicinity of Federal Lands That Are at High Risk From Wildfire" issued by the Secretary of Agriculture and the Secretary of Interior in accordance with Title IV of the U.S. Dept. of Interior and Related Agencies Appropriations Act, 2001. OR • A group of homes and other structures with basic infrastructure and services (such as utilities and collectively maintained transportation routes) within or adjacent to Federal land AND • In which conditions are conducive to large-scale wildland fire disturbance event AND • For which a significant threat to human life or property exists

as a result of a wildland fire disturbance event. At-Risk Ravalli County

communities include: Florence, Stevensville, Victor, Pinesdale, Corvallis,

Hamilton, Darby, West Fork, Sula, and other areas where numerous

residents live in the Wildland Urban Interface in Ravalli County that meet

the above mentioned criteria." The EIS does not disclose this wildland

urban interface definition or demonstrate that the Project wildland urban

interface complies with this definition.

54.    In contrast, the 2009/2010 Bitterroot Community Wildfire Protection Plan

wildland urban interface would have dramatically expanded the wildland

urban interface, and included a one-mile buffer zone along the entire

National Forest boundary, regardless of housing density.

55.    It appears from maps discovered in the Project file that the Forest Service

used the 2009/2010 wildland urban interface map rather than the 2006/2007

wildland urban interface map because the map used for the Project appears

to contain a one-mile buffer zone along the entire National Forest boundary,

regardless of housing density.

56.    The Project file received by Plaintiffs does not contain the 2006/2007

wildland urban interface map that is currently in effect in Ravalli County.

57.    Instead, the Project file contains two maps that both set forth the 2009/2010

Bitterroot Community Wildfire Protection Plan wildland urban interface

map, which was never authorized by the Ravalli County Commissioners.

58.    In response to public concerns and questions regarding the Project and how
many people actually live adjacent to the Project area, the Forest Service
refused to disclose any such analysis and instead simply stated:
"Landownership including individual addresses for the WUI adjacent to the
project area are available through Ravalli County tax records and the
Montana Cadastral Mapping Project (http://svc.mt.gov/msl/mtcadastral)."

59.    In other words, although there is available data, the Forest Service did not
complete an analysis of the available data on human or structure density to
support its delineation of the Project wildland urban interface.

60.    Indeed, it appears that the vast majority of private land along the Project
area boundary is "vacant" agricultural land with no living units.

61.    Accordingly, it is unclear how much, if any, of the Project area would meet
the definition of wildland urban interface from the 2006 Bitterroot
Community Wildfire Protection Plan, which is currently in place.

**D.  Old Growth**

62.    Logging in the Bitterroot Valley started in the late 1840's and continued
through the 1870's.  Early logging was mostly to produce logs and other
wood products for use by local farmers and ranchers. This subsistence
logging took the most accessible timber from the foothills and lower slopes

of the Bitterroot Mountains. Once nearby timber was exhausted, the mills were dismantled and moved to a new location.

63.    In the 1880's through the early 1900's the Bitterroot's lumber industry expanded from subsistence logging and milling for local use to providing mass quantities of timber and lumber for hardrock mines, railroads and growing cities throughout Montana. Completion of the railroad to its terminus at Darby in 1889 allowed lumber companies to exploit timber on a large scale from the upper valley, along Tin Cup Creek and the West Fork of the Bitterroot. The logging by the Anaconda Copper Company was extensive.  In some areas "Nothing is left standing, for every tree over 6 inches in diameter is converted into lumber."

64.    This historic logging dramatically reduced the amount of old growth in the Bitterroot, particularly the ponderosa pine in the lower elevations, and explains the lack of old growth in some 3rd order drainages today.

65.    Old growth habitat in the Gold Butterfly Project area is composed largely of forest types dominated by Douglas-fir and ponderosa pine at lower to mid elevations, and Douglas-fir, Engelmann spruce and subalpine fir at mid to upper elevations.

66.    The Project analysis indicates that old growth distribution within the Project area fails the applicable Forest Plan Standards for old growth habitat in one

of the third order drainages designated as "Management Area 1," and four of the third order drainages designated as "Management Area 2."

67.   Internal agency meeting notes state that old growth logging will "remov[e] ½ to 2/3 of the basal area."

68.   Internal agency meeting notes further indicate that the criteria the Forest Service will use to determine whether a logged stand still counts as old growth "for most of the units is 8 TPA [trees per acre] over 21" dbh and 170 years or older" and "Whitebark pine and subalpine fir old growth requirements are 10 [trees per acre] > 13" dbh."

69.   Internal agency meeting notes further estimate "that at least 1/3 or slightly more of the overstory will remain in many of the units."

70.   The public was concerned about old growth logging, and noted in comments on the draft EIS that "[t]he DEIS does not provide a diameter limit on trees to be cut in old growth stands. The DEIS fails to explain how this meets HFRA requirements."

71.   In response, the Forest Service stated: "A diameter limit is not specified in the HFRA language."

72.   Internal agency meeting notes found: "During our conversations, it became obvious that it is difficult to definitively say that that old growth characteristics would be retained following treatment. Any treatment

activity (e.g., logging, burning, etc.) has the potential to remove stands from old growth."

73.  Forest Plan Forest-wide Management Standard (1)(e)(2) states: "Stand conditions that qualify as old growth will vary by habitat type and landform. Criteria to consider for identifying old growth include:

• large trees, generally 15 per acre greater than 20 inches dbh for species other than lodgepole pine and 6 inches for lodgepole pine;

• canopy closure at 75 percent of site potential;

• stand structure usually uneven-aged or multistoried;

• snags, generally 1.5 per acre greater than 6 inches dbh and .5 per acre greater than 20 inches;

• more than 25 tons per acre of down material greater than 6 inches diameter;

• heart rot and broken tops in large trees are common; and

• mosses and lichens are present."

74.  The Forest Plan also provides the following definition of old growth: "A forest stand with 15 trees per acre greater than 20 inches dbh (6 inches in lodgepole pine) and canopy closure that is 75 percent of site potential. The stand is uneven-age or multistoried. There should be 1.5 snags per acre greater than 6 inches dbh; 0.5 snags per acre greater than 20 inches dbh; and

25 tons per acre of down material greater than 6 inches diameter. Heart rot and broken tops are common and mosses and lichens are present."

75. In the Project EIS, the Forest Service admitted that it was not using the Forest Plan criteria/definition of old growth, but rather using an alternative definition set forth in an internal agency document: "old growth criteria used were the more current R1 definitions in Green et al. (1992, errata 2005)."

76. Public commenters requested that the Forest Service clarify how the Project will retain the old growth characteristics required by the Forest Plan. In response, the Forest Service refused to address the issue in the EIS, and instead directed the public to a document in the Project file – the "Wildlife Specialist Report, pages 10-16 (PF-WILD-001)."

77. The Wildlife Specialist Report at pages 10-16 does not disclose the Forest Plan old growth definition/criteria or apply them, nor does it disclose the actual criteria used to assess old growth for the Project area.

78. Consistent with the agency meeting notes quoted above, a document in the project file designated as SILV-013 indicates that the following criteria were used to calculate old growth for the Project:

- 10 trees per acre greater than 20 inches dbh in Douglas fir forest type and 8 trees per acre greater than 20 inches dbh in ponderosa pine

17

forest type;

- no requirements for canopy closure;

- no requirements for uneven-aged or multi-storied structure;

- no requirements for snags per acre over 6 inches dbh or snags per
  acre over 20 inches dbh;

- no requirements for tons per acre for down material greater than 6
  inches diameter;

- no requirements for heart rot and broken tops;

- no requirements for mosses and lichens.

79.    Accordingly, the old growth criteria used for the Project are significantly
less protective than the old growth definition and criteria set forth in the
Forest Plan standard.

80.    In particular, the Forest Plan mandates 15 large trees per acre for old
growth, but the Forest Service old growth calculations for the Project only
require 8 or 10 large trees per acre; also, the Forest Plan mandates 75%
canopy closure, while the agency indicates the Project will only retain 33%
canopy closure.

81.    The Forest Plan further mandates that in Management Area 1, old growth
must be in stands of at least 40 acres, and must comprise at least 3% of each
third order drainage.

82.    The Forest Plan further mandates that in Management Areas 2 and 3a and

3c, old growth must be in stands of at least 40 acres, and must comprise at

least 8% of each third order drainage.

83.    The Forest Plan further mandates that in Management Areas 3b old growth

must be in stands of at least 40 acres, and must comprise either 25% or 50%

of riparian areas.

84.    Neither the Project EIS nor the Wildlife Specialist Report discloses whether

all old growth acres counted in the Project area occur in stands of 40 acres

or more.

85.    A document in the Project file designated as SILV-006 appears to find that a

number of stands are counted as old growth although they are less than 40

acres.

86.    The supplemental EIS discloses:  "There are 389 third order drainages

across the Forest and 232 of those drainages meet Forest Plan minimums for

percentages of old growth by management area using Green et al. criteria. If

using the Forest Plan criteria only 74 drainages meet the requirements for

old growth."

87.    In other words, 81% of the drainages on the Forest violate the Forest Plan

old growth standard.  If the agency changes the definition of old growth to

the more lax definition under Green et al, only 40% of the drainages violate

the standard.

88.  In the Project area, "[o]f the 11,966 acres inventoried, 2,830 acres meet Green et al. criteria for old growth . . . .Using the Forest Plan old growth definition criteria, only 471 acres of old growth meet the Forest Plan definition."

89.  In other words, as the supplemental EIS states: "the application of the Green et al. criteria for identifying old growth in the Gold Butterfly project area and across the Forest results in more old growth acres identified than would the application of the Forest Plan definition."

90.  Additionally, "the canopy closure criterion [75% retention] was not used for this comparison. . . .  this additional information would likely reduce the number of acres of old growth identified by the Forest Plan."

91.  Due to the Forest Plan violations, the Forest Service issued a supplemental EIS with a "project-specific" Forest Plan amendment to exempt the Project from complying with the Forest Plan old growth requirements.  The "project-specific" Forest Plan amendment eliminates any minimum canopy closure requirement, reduces minimum retention of 15 large trees per acre to 8 large trees per acre, and eliminates the 40-acre minimum stand size.

92.  In other words, the "project-specific" Forest Plan amendment allows a 46% reduction in large trees per acre, unlimited reduction in canopy closure, and

the whittling down of old growth forest stands to stands as small as four acres in size.

93.    The Forest Plan designates the pine marten as an old growth management indicator species: "The amount and distribution of old growth will be used to ensure sufficient habitat for the maintenance of viable populations of existing native and desirable non-native vertebrate species, including two indicator species, the pine marten and pileated woodpecker."

94.    The Forest Plan mandates annual monitoring of three transects and annual reporting of "Pine marten population in relation to habitat changes."

95.    It does not appear that the Forest Service has ever complied with this monitoring requirement – the Forest Service does not provide any annual transect data for pine martens or any population trend estimates for pine martens in its monitoring report.

96.    Despite the fact that the Forest Service has never collected the monitoring data required by the Forest Plan, and has not therefore established any population trend for pine marten as required by the Forest Plan, the Record of Decision represents: "Monitoring data for pine marten was last collected in 2020 and revealed that marten distribution and detections have trended upwards."

97.    The Forest Plan also mandates annual monitoring of three transects and

annual reporting of "Pileated woodpecker population in relation to habitat changes."

98.   However, the Forest Service concedes it has not monitored populations of pileated woodpeckers since 2018, citing the "Biennial Monitoring Report."

99.   Further, Table 2.4–3 in the "Biennial Monitoring Report" on the Forest Service's website actually shows that the last monitoring data was collected for pileated woodpecker populations in 2017.

100.  Additionally, Table 2.4–3 in the "Biennial Monitoring Report" shows that both the mean and median numbers are below 1.0, which "indicates declining trend" for pileated woodpeckers in the Bitterroot National Forest.

101.  The Forest Service Record of Decision represents that "pileated woodpecker detections have remained relatively stable" and does not disclose the declining trend found in Table 2.4–4 of the agency's own monitoring report.

102.  The wildlife report indicates that the Project would eliminate 2,998 acres of high and moderate quality marten habitat.

103.  The wildlife report indicates that the Project would eliminate 2,451 acres of high and moderate quality pileated woodpecker habitat.

104.  Nonetheless, the Forest Plan amendment concludes that "[t]he proposed amendment does not substantially lessen protections for a specific resource or use (§ 219.13(b)(5)(ii)(A)) or have any substantial impacts to a species or

substantially lessen protections for a species (36 CFR 219.13(b)(6))."

105.    The supplemental EIS also asserts: "A project-specific amendment to support using the old growth definitions in Green et al. for the Gold Butterfly project rather than the 1987 Forest Plan old growth criteria would not result in negative cumulative effects to pileated woodpecker or marten when considering the effects of the recent Mud Creek project-specific amendment, and the foreseeable Bitterroot Front project specific amendment and the Forest-wide programmatic amendment."

106.    No quantified, detailed information regarding the acreage of marten and pileated woodpecker habitat removal that will be facilitated by these three amendments is provided to support this conclusion in the "Cumulative Effects" section of the supplemental EIS.

**E.    Grizzly Bears**

107.    In the original November 14, 2018 Project Biological Assessment, the Forest Service found: "There are only two relatively recent confirmed grizzly bear occurrences in the Sapphire Mountains. In September 2002 a grizzly was videotaped feeding on a moose gut pile in the Rock Creek drainage, and the next day appeared on private property on Sunset Bench about 4 miles southeast of Stevensville and about 8 miles northwest of the northwest corner of the Gold Butterfly project area. This bear is thought to

have returned to the east side of the Rock Creek drainage (J. Jonkel, pers. comm.). The route that this bear took over the Sapphires is not known, but it is likely that it was near the northern edge of the project area. In October 2012 grizzly tracks were photographed and verified on a road in the head of Sleeping Child Creek, about 19 miles south of the Gold Butterfly project area (Ibid)."

108.  In the original November 14, 2018 Project Biological Assessment, the Forest Service found: "Currently, the number of grizzly bears using the BNF in the Sapphire Mountains area is none to very low . . . ."

109.  In the original November 14, 2018 Project Biological Assessment, the Forest Service ultimately found: "Grizzly bears have been documented on the Forest and have been confirmed in areas fairly close to the action area, but have not been confirmed within the action area. It is possible that grizzly bears may be present and may travel through the action area as transients."

110.  Subsequently, however, the Forest Service changed its determination for the 2023 Record of Decision.

111.  For the 2023 Project Record of Decision, the Forest Service issued a "no effect" conclusion for grizzly bears for the Project based on a June 16, 2022 FWS map that does not show grizzly bears as a species that "may be

present" in the Project area.

112. Based on this "no effect" finding, the Forest Service did not analyze the direct, indirect, and cumulative effects of the Project and Forest Plan amendments on grizzly bears in the NEPA analysis for the Project.

113. Subsequently, new information has surfaced regarding numerous confirmed grizzly bears in the Sapphire Mountains.

114. As published in an August 7, 2023 Missoulian article, "a grizzly bear was captured . . . at MPG Ranch in the northern Sapphire Mountains near Florence. . . . Then, 22 hours later, another grizzly showed up at the same site. It was not caught. In addition to those two bears, a young male grizzly. . . recently crossed Interstate 90 . . . and is now in the Sapphire Mountains — making three confirmed grizzly bear sightings in the Bitterroot Valley in three days."

115. The confirmed presence of at least three grizzly bears in the Sapphire Mountains in August 2023 was not discussed in the Project EIS.

**F.    Wolverines**

116. Wolverines were listed as a threatened species under the Endangered Species Act on November 29, 2023.

117. An August 2023 wolverine monitoring report confirmed the presence of a lactating, i.e. reproducing, female wolverine in the Sapphire Mountains.

118.    The monitoring station in the Sapphire Mountains is denoted as "PA" and the female wolverine is denoted as "BNF23-F1."

119.    In total, the 2023 monitoring efforts detected five wolverines in the Bitterroot National Forest – four males and one female.

120.    Four of the wolverines (three males and one female) were detected at the Sapphire Mountains monitoring station (PA), while one wolverine (male) was detected at a monitoring station on the west side of the Bitterroot Valley (monitoring station LH).

121.    Wolverine Monitoring Station PA (denoted in the second image below with a red star) is directly east of Corvallis, Montana, within the Bitterroot National Forest, and therefore appears to be within the Gold Butterfly Project area:

//

//

//



## *Bitterroot National Forest*



122.   The confirmed presence of a lactating female wolverine – *the only one found in 2023 monitoring across the Bitterroot, Beaverhead-Deerlodge, Helena, and Lewis & Clark National Forests* – in the Gold Butterfly Project area is not discussed in the Project EIS.

## G.  Elk

123.   Many elk in this area winter on private lands several miles to the west of the Project area. Some of these elk travel through the Project area during their spring or fall migrations between winter range and summer range high in the Sapphires.  However, many of the elk in Hunting District 261 have essentially become year-round residents on lower elevation private lands, and no longer migrate to summer ranges due to the high road density on public lands.

124.   As one public comment notes: "If there is logging in this whole area and disruption to the winter elk refuge and calving areas it will force the elk down into the valley. As ranchers we raise hay. The Willow Creek elk herd already does a significant amount of damage to our haystacks and fences. In addition the elk will be pushed down to our property where there is a land easement and no hunting. This will be detrimental to the forest plan goal of maintaining hunting opportunity."

125.   The Forest Service concedes: "elk occur frequently on private land in the

Willow Creek drainage, and cause damage to fences and forage supplies. . . . the combination of reduced cover and increased human access in some parts of the project area could displace more elk onto adjacent private land during some parts of the year . . . ."

126. Forest Plan Forest-wide Management Standard (1)(e)(13) states: "The recommendations in the 'Coordinating Elk and Management' report will be considered during management and transportation planning (Lyon, et al, 1985)."

127. The full name of this report is "Coordinating Elk and Timber Management. Final Report of the Montana Cooperative Elk-Logging Study."

128. Regarding Forest-wide Management Standard (1)(e)(13), the Forest Plan Record of Decision clarifies (emphasis added): "Recommendations from the 'Coordinating Elk and Timber Management' report and the Montana Fish and Game Commission's Road Management Policy *will be incorporated* in project plans (Forest Plan, Chapter II)."

129. The Project EIS does not disclose the recommendations from the "Coordinating Elk and Timber Management" report.

130. In particular, the "Road Management" recommendation from "Coordinating Elk and Timber Management" states: "Where maintenance of elk habitat quality and security is an important consideration, open road densities should

be held to a low level, and every open road should be carefully evaluated to determine the possible consequences for elk."

131. "Coordinating Elk and Timber Management" defines "low" open road density as "less than one-half mile of road per square mile."

132. 16 different drainages in the Project area have an open road density that equals or exceeds one-half mile of road per square mile:

| Drainage | Open Road Density | Meets Forest Plan Standard? |
|---|---|---|
| 04a242-1 | 1.3 | No |
| 04a242-2 | 1.6 | No |
| 04a243-3 | 1.4 | No |
| 04c240-2 | 0.9 | No |
| 07a108-1 | 2.2 | No |
| 07a110-1 | 1.2 | No |
| 07a112-2 | 1.2 | No |
| 07a115-1 | 1.9 | No |
| 07b110-1 | 1.3 | No |
| 07c110-9 | 1.6 | No |
| 07c115-1 | 2.7 | No |
| 07c115-2 | 3.7 | No |
| 07c115-3 | 1.1 | No |
| 07c116-1 | 2.5 | No |
| 07c116-2 | 1.8 | No |
| 07c116-3 | .9 | No |

133.    Forest Plan Forest-wide Management Standard (1)(e)(14) states: "Manage

roads through the Travel Plan process to attain or maintain 50 percent or

higher elk habitat effectiveness (Lyon, 1983) in currently roaded third order

drainages.  Drainages where more than 25 percent of roads are in place are

considered roaded.  Maintain 60 percent or higher elk habitat effectiveness in

drainages where less than 25 percent of the roads have been built."

134.    Seven different drainages in the Project area violate the Forest Plan elk

habitat effectiveness standard:

| Drainage | Open Road Density | Meets Forest Plan Standard? |
|---|---|---|
| 04a243-3 | 1.4 | No |
| 07a108-1 | 2.2 | No |
| 07a110-1 | 1.2 | No |
| 07a115-1 | 1.9 | No |
| 07c115-1 | 2.7 | No |
| 07c115-2 | 3.7 | No |
| 07c116-1 | 2.5 | No |

135.    The Project Record of Decision states: "Implementation of the Selected

Alternative, as modified, will require a project-specific forest plan

amendment to the 1987 Bitterroot Forest Plan to suspend certain Forest Plan

standards relating to elk habitat effectiveness and thermal cover.  Discussion

concerning the plan amendment and its effects is found in Appendix D of the Gold Butterfly FEIS."

136. This Project follows a pattern of non-compliance with the Forest Plan elk habitat standards: "There have been 11 project-specific amendments related to EHE since the Forest Plan was approved in 1987. There have been 9 project-specific amendments related to thermal and hiding cover."

137. The 2023 Record of Decision further states: "The Bitterroot Forest has recognized the need to and is currently planning a programmatic amendment of the Forest Plan for these same elk . . . standards."

138. The Forest Service states: "The plan amendment is guided by the 2012 Planning Rule, which has different provisions from the 1982 Planning Rule procedures that the Forest Service used to develop the existing forest plan."

139. Public commenters raised the concern that the EIS "fails to document an analysis consistent with the 2012 Planning Rule regarding amendments" and that the Forest Service failed to "use the best available scientific information to inform the amendment process."

140. Public commenters further stated: "The purpose of the amendments, as stated in the FEIS, is 'to allow six third order drainages in the analysis area to not meet EHE standards'. . . .   To merely 'allow' deviation of the Forest Plan is not adequate justification . . . ."

141.  In its response to comments, the Forest Service acknowledged that

"[m]ultiple objectors contend the project-specific amendment to the Forest

Plan. . . violates NFMA and the 2012 Planning Rule."  However, it argued:

> The Forest Plan amendments included in the project are
> site-specific plan amendments to address elk habitat
> effectiveness, thermal cover, and hiding cover. The amendments
> are needed because the proposed action does not meet elk
> related Forest Plan Standards (See FEIS Appendix D). The FEIS
> (Appendix D) describes the use of more current research to
> analyze elk habitat than what was utilized in the Forest Plan.
> The project addressed the above criteria of 36 CFR 219.13(a) by
> the following:
>
> . . .
>
> 5. The Forest Service determined the substantive requirement
> the amendments applied is 219.10 (a)(5) – 10: Multiple Use
> – a- Integrated resource management for multiple use – 5 -
> Habitat conditions, subject to the requirements of § 219.9,
> for wildlife, fish, and plants commonly enjoyed and used by
> the public; for hunting, fishing, trapping, gathering,
> observing, subsistence, and other activities (in collaboration
> with federally recognized Tribes, Alaska Native
> Corporations, other Federal agencies, and State and local
> governments). FEIS Appendix D discusses how the plan
> amendment meets the planning rule requirement.

142.  Regarding elk habitat effectiveness, FEIS Appendix D states:

> [elk habitat effectiveness] s of 50% and 60% equate to 2 miles and
> 1 mile of open road per square mile, respectively (Lyon 1983). This
> standard supports the Forest Plan objectives of maintaining habitat
> to support viable populations of wildlife species, and cooperating
> with the state of Montana to maintain the current level of big game
> hunting opportunities.
> . . .

> The  [elk habitat effectiveness] model described by Lyon was the best information available at the time the Plan was implemented. Subsequently, a model developed by Hillis et al. (1991) has been used in Bitterroot National Forest project planning to maintain elk security during hunting season when elk are most vulnerable.

143. Appendix D further states: "We have added an elk security analysis (Hillis et al. 1991) to our environmental analysis protocol that has proven to be a better tool than [elk habitat effectiveness] analysis for achieving the Forest Plan objective to maintain elk populations and hunting season opportunities in cooperation with the Montana Department of Fish, Wildlife and Parks."

144. The implication in FEIS Appendix D is that the Forest Service will implement a new, better elk habitat standard – Hillis elk security – to maintain elk habitat, and hunting season opportunities, on the Forest.

145. Hillis et al (1991) requires: "To provide a reasonable level of bull survival, each security area must be a nonlinear block of hiding cover $\geq$ 250 acres in size and $\geq$ one-half mile from any own road. Collectively, these blocks must equal at least 30% of the analysis unit."

146. Elk security blocks currently constitute only 8.0% of the Project elk analysis unit (11,043 acres).

147. Elk security areas are limited by an extensive road system in parts of the herd unit area and a lack of hiding cover in large areas.

148. Elk security blocks would be permanently reduced to 7.7% from this Project

(10,684 acres).

149.  Thus, the Project area does not meet the 30% Hillis standard now, and the Project will move the area farther away from meeting this standard.

150.  Hillis et al (1991) further states: "Closed roads-Roads may be closed (to motorized travel) to provide security and a buffer between security areas and open roads. However, the minimum distance between open roads and securiry areas increases as closed-road densities increase within both the security area and buffer. Closed roads located within security areas may increase elk vulnerability by providing hunters with walking and shooting lanes. Use of horses and increasing use of mountain bikes by hunters on closed roads allows them better access and increases elk vulnerability, compared to unroaded habitats. Therefore, roads within security areas should be kept to an absolute minimum."

151.  There does not appear to be a calculation of closed roads anywhere in the Project record.

152.  The Forest Service does not demonstrate that closed roads within security areas will be "kept to an absolute minimum" per Hillis.

VI. CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**

*The Project-specific Forest Plan Amendment for old growth and the failure to*

35

*comply with Forest Plan monitoring requirements for old growth management*

*indicator species violate NFMA, NEPA, and the APA.*

153.  All previous paragraphs are incorporated by reference.

154.  **Forest Plan Amendment.**  As discussed above, the Forest Service issued a site-specific Forest Plan Amendment for the Project to exempt the Project from complying with the Forest Plan old growth definition and standard. The new site-specific old growth definition allows a 46% reduction in large trees per acre, unlimited reduction in canopy closure, and the whittling down of old growth forest stands to stands as small as four acres in size. It is unclear which, if any, old growth management indicator species could inhabit these denuded stands, and the record indicates that Project activities will eliminate 2,998 acre of habitat for pine marten, and 2,451 acres of habitat for pileated woodpeckers, both of which are Forest Plan management indicator species for old growth. First, the Forest Plan Amendment is unlawful because there is no analysis of reasonable alternatives as required under NEPA. *All. for the Wild Rockies v. Marten*, 585 F. Supp. 3d 1252, 1275 (D. Mont. 2021).  Additionally, the cumulative effects analysis for the Forest Plan Amendment is inadequate because it fails to disclose any quantified, meaningful details regarding how *de facto* or actual past, present, and reasonably foreseeable Forest Plan amendments for the same old growth

standard/definition impact moderate and high quality habitat for the Forest

Plan management indicator species – pine marten and pileated woodpecker.

*See id.*  The record indicates that the Forest Service plans to implement at

least three more such amendments.  The record also indicates that the Forest

Service has been violating the Forest Plan definition for years, with no

detailed, quantified disclosure of how years of unlawful implementation (i.e.

overestimating old growth habitat acreage to meet the minimum percentage

mandates, as well as removing large trees and canopy cover within that

habitat in a manner that did not comply with the Forest Plan old growth

definition) has impacted available habitat for the Forest Plan management

indicator species. Furthermore, the Forest Service's practice of violating the

Forest Plan for years, issuing successive site-specific Forest Plan

amendments, and fundamentally changing old growth management across

the Forest, amounts to a *de facto* significant Forest Plan amendment that

must be analyzed in a full EIS.  *See id* at 1278. Finally, the Forest Plan

amendment violates a number of provisions from the 2012 NFMA planning

regulations:  the Forest Service fails to apply the substance of 36 C.F.R.

§219.9 to the amendment, fails to determine whether the amendment

substantially lessens protections for old growth management indicator

species, and fails to analyze whether pine marten or pileated woodpecker

should be treated as a species of conservation concern.

155. **Forest Plan Monitoring Requirements.** The Ninth Circuit holds: "monitoring and management practices are reviewable when, and to the extent that, they affect the lawfulness of a particular final agency action. [] Where the Forest Service generally fails to comply with NFMA and the governing Forest Plan, and where that failure renders an approval of a timber sale unlawful, this Court has power, under the APA, to review the sale and to conclude that its approval was unlawful—even if doing so would, as a practical matter, require us to consider forest-wide management decisions." *Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1067 (9th Cir. 2002). As discussed above, the Forest Service has never complied with the Forest Plan monitoring requirements for pine marten, and it has not complied with the Forest Plan monitoring requirements for pileated woodpecker since 2017. At least one source outside the agency finds that the pileated woodpecker population on the Forest is in decline, and there is no population trend offered for pine marten. Despite these facts, the Project will allow the removal of thousands of acres of moderate and high quality habitat for both old growth management indicator species, while at the same time changing the Forest Plan old growth definition to vastly overestimate old growth and thereby allow increased logging of old growth forests. These actions

threaten the viability of old growth species because they are occurring

without the population trend monitoring of old growth management indicator

species that is mandated by the Forest Plan and necessary to make a reasoned

decision – in other words, the agency is flying blind.  The Forest Service's

Forest-wide failures render the approval of this specific Project unlawful.

Additionally, the EIS is misleading on these issues in violation of NEPA and

the APA. *See Native Ecosystems Council v. Lannom*, 598 F. Supp. 3d 957,

974 (D. Mont. 2022).

## SECOND CLAIM FOR RELIEF

*The Project-specific Forest Plan Amendment for elk habitat, the failure to comply*

*with the Hillis standard, and the failure to comply with the Forest Plan standard*

*regarding the Montana Elk-Logging Study, violate NFMA, NEPA, and the APA.*

156.   All previous paragraphs are incorporated by reference.

157.   **Forest Plan Amendment.** As discussed above, the Project area violates the

Forest Plan elk habitat effectiveness and thermal cover standards, and

therefore, the Forest Service issued a Forest Plan amendment for the Project

to exempt the Project from complying with these standards.  First, the Forest

Plan Amendment is unlawful because there is no analysis of reasonable

alternatives as required under NEPA.  *All. for the Wild Rockies v. Marten*,

585 F. Supp. 3d 1252, 1275 (D. Mont. 2021).  Additionally, the cumulative

effects analysis for the Forest Plan Amendment is inadequate because it fails to disclose any quantified, meaningful details regarding how past, present, and reasonably foreseeable Forest Plan amendments for the same elk standards impact elk habitat, hiding cover, security, and displacement from public to private lands. *See id.* The record indicates that the Forest Service has issued 20 site-specific Forest Plan amendments of these elk habitat effectiveness and cover standards in the past, and plans to implement at least three more such amendments. Furthermore, the Forest Service's practice of issuing successive site-specific Forest Plan amendments for these elk standards amounts to a *de facto* significant Forest Plan amendment that must be analyzed in a full EIS. *See id* at 1278. Finally, the Forest Plan amendment violates a number of provisions from the 2012 NFMA planning regulations: the Forest Service fails to apply the substance of 36 C.F.R. §219.9 to the amendment, fails to determine whether the amendment substantially lessens protections for elk, fails to analyze whether elk should be treated as a species of conservation concern, fails to formally adopt Hillis as a Forest Plan standard, and fails to demonstrate compliance with the Hillis standard that the Forest Service found to be the best available science.

158. **Hillis Elk Security Standard.** In the EIS Appendix D analysis of the Forest Plan amendment, the Forest Service implies that elk habitat effectiveness is

no longer the best available science; rather, the Forest Service believes that Hillis et al (1991) security is now the best available science and thus the Forest Service is relying on Hillis security as the best available science that applies to the Forest Plan amendment. However, the EIS fails to demonstrate compliance with the Hillis security standard. "When the Forest Service employs criteria to show a project's compliance with NFMA or a Forest Plan, it must comply with those criteria, regardless of whether they are labeled as 'advisory.' []. Otherwise, the EIS is 'misleading in violation of NEPA.'" *Native Ecosystems Council v. Weldon,* 848 F. Supp. 2d 1207, 1214–15 (D. Mont. 2012), *vacated as moot* 2012 WL 5986475. The Hillis security standard requires at least 30% of an area to be maintained as elk security but the Project area currently only has 8.0% elk security, and the Project will further reduce that elk security to 7.7%. As further noted above, the Project will result in a net increase of 17.1 miles of permanent system roads. Thus, the EIS is misleading in violation of NEPA. Additionally, the Forest Service's failure to comply with the best available science standard that it chose for itself in place of elk habitat effectiveness violates NFMA, including the planning regulations, and is arbitrary and capricious in violation of the APA. *See Native Ecosystems Council*, 848 F. Supp. 2d at 1214–15.

159. **Montana Elk-Logging Study.**  The Forest Plan Record of Decision states that the Montana Elk-Logging Study recommendations will be followed in all projects.  The Project EIS fails to demonstrate compliance with the Montana Elk-Logging Study recommendations, including, in particular, the "Road Management" recommendation:  "Where maintenance of elk habitat quality and security is an important consideration, open road densities should be held to a low level, and every open road should be carefully evaluated to determine the possible consequences for elk."  "Coordinating Elk and Timber Management" defines "low" open road density as "less than one-half mile of road per square mile."  However, 16 different drainages in the Project area have an open road density that equals or exceeds one-half mile of road per square mile, and there is no evaluation of every open road as required. This violation of the Forest Plan, and/or failure to take a hard look at these Forest Plan requirements, violate NFMA and/or NEPA.  *All. for the Wild Rockies v. Marten*, 585 F. Supp. 3d 1252, 1273 (D. Mont. 2021).

### THIRD CLAIM FOR RELIEF

*The Forest Service's use of HFRA Section 6591a (d) authority to approve the Project violates HFRA, NEPA, and APA.*

160.  All previous paragraphs are incorporated by reference.

161.  The Record of Decision (ROD) states: "This project is proposed under

Healthy Forests Restoration Act (HFRA; 16 USC §6591) authority. The

project area lies within Designated Areas that were requested by the

Governor of Montana and designated by the Secretary of Agriculture."

162. The Record of Decision (ROD) states: "Analysis and documentation has

been carried out in accordance with Section 602(d) of HFRA."

163. The HFRA mandates: "Projects carried out under this subsection shall be

considered authorized hazardous fuel reduction projects for purposes of the

authorities described in paragraph (2)." 16 U.S.C. § 6591a (d)(3).

164. The HFRA mandates: "An authorized hazardous fuel reduction project shall

be conducted consistent with the resource management plan and other

relevant administrative policies or decisions applicable to the Federal land

covered by the project." 16 U.S.C. § 6512 (b).

165. In violation of 16 U.S.C. § 6512 (b), the Project is not consistent with the

Bitterroot Forest Plan. The Project does not comply with the Forest Plan

standards for elk habitat effectiveness, thermal cover, or the implementation

of the Montana Elk-Logging Study. Moreover, to the extent the Hillis elk

security standard is a lawful substitution for the elk habitat effectiveness

standard, the Project also does not comply with the Hillis standard. Further,

the Project does not comply with the Forest Plan monitoring requirement for

old growth management indicator species. Additionally, because the Project-

specific Forest Plan amendment redefining and vastly overestimating old growth is unlawful, the Project also does not comply with the Forest Plan old growth standard. Thus, the Forest Service cannot lawfully use the HFRA to authorize this Project.

166. In violation of NEPA, the Project EIS never discloses the HFRA forest plan consistency requirement at 16 U.S.C. § 6512 (b) to the public, and therefore fails to take a hard look at whether HFRA authority can be lawfully used to approve the Project.

167. In addition, the HFRA mandates: "The Secretary shall carry out projects under subsection (d) in a manner that maximizes the retention of old-growth and large trees, as appropriate for the forest type, to the extent that the trees promote stands that are resilient to insects and disease." 16 U.S.C. § 6591a (e).

168. In violation of 16 U.S.C. § 6591a (e), the Project allows the logging of old growth and large trees across hundreds of acres. Moreover, as discussed above, the Forest Service refused to use the Forest Plan definition of old growth for the Project and instead used a less protective definition. Thus, although the Forest Plan requires retention of "large trees, generally 15 per acre greater than 20 inches dbh for species other than lodgepole pine and 6 inches for lodgepole pine" in order to qualify as old growth, the Project

analysis only requires 10 trees per acre greater than 20 inches dbh in Douglas fir forest type and 8 trees per acre greater than 20 inches dbh in ponderosa pine forest type in order to qualify as old growth. The Forest Plan definition also requires 75% canopy closure in old growth where possible, but the Project allows logging down to 33% canopy closure in old growth.   In other words, the Project minimizes retention of old growth and large trees in the Project area, rather than maximizing retention of old growth and large trees as required under the HFRA.

169.   Because the Project violates the HFRA, the Forest Service cannot lawfully use HFRA authority to approve this Project.  Thus, the Project must be remanded for preparation of a new EIS under normal NEPA procedures, including but not limited to a full consideration of a reasonable range of alternatives.

## FOURTH CLAIM FOR RELIEF

*The Forest Service must prepare a supplemental EIS to address new information*

*regarding grizzly bears in the Sapphire Mountains.*

170.   All previous paragraphs are incorporated by reference.

171.   Federal agencies must prepare a supplemental NEPA document when there are "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."  40 C.F.R. §§

45

1502.9(d)(1)(ii)(2020).

172. Significant new circumstances may include new information regarding impacts on a listed species. *See Native Ecosystems Council v. Tidwell*, 599 F.3d 926, 937 (9th Cir. 2010).

173. As discussed above, after the EIS was completed for this Project, in August of 2023, the *Missoulian* newspaper reported three verified and distinct grizzly bears in the Sapphire Mountains.

174. This new information of recurring, verified grizzly presence in the Sapphire Mountains was not considered in the Project EIS, and is significant new information that requires a supplemental EIS in order to ensure that the Forest Service takes a "hard look" at potential impacts to grizzly bears during this 8-year logging and road-building project.  *See Ctr. for Biological Diversity v. U.S. Forest Serv.*, 687 F. Supp. 3d 1053, 1087 (D. Mont. 2023).

**FIFTH CLAIM FOR RELIEF**

*The Forest Service must prepare a supplemental EIS to address new information regarding wolverines in the Sapphire Mountains.*

175. All previous paragraphs are incorporated by reference.

176. Federal agencies must prepare a supplemental NEPA document when there are "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."  40 C.F.R. §§

1502.9(d)(1)(ii)(2020).

177.   Significant new circumstances may include new information regarding impacts on a listed species. *See Native Ecosystems Council v. Tidwell*, 599 F.3d 926, 937 (9th Cir. 2010).

178.   Wolverines were listed under the Endangered Species Act in November 2023.

179.   An August 2023 wolverine monitoring report confirmed the presence of a lactating, i.e. reproducing, female wolverine in the Sapphire Mountains.

180.   In total, the 2023 monitoring efforts detected five wolverines in the Bitterroot National Forest – four males and one female. Four of the wolverines (three males and one female) were detected at the Sapphire Mountains monitoring station (PA), while only one wolverine (male) was detected at a monitoring station on the west side of the Bitterroot Valley (monitoring station LH).

181.   Wolverine Monitoring Station PA is directly east of Corvallis, Montana, within the Bitterroot National Forest, and therefore appears to be within the Gold Butterfly Project area.

182.   This new information was not considered in the Project EIS, and is significant new information that requires a supplemental EIS in order to ensure that the Forest Service takes a "hard look" at potential impacts to

wolverines during this 8-year logging and road-building project.  *See Ctr. for Biological Diversity v. U.S. Forest Serv.*, 687 F. Supp. 3d 1053, 1087 (D. Mont. 2023).

### VII. RELIEF REQUESTED

For all of the above-stated reasons, Plaintiffs request that this Court award the following relief:

A. Declare that the Project violates the law;

B. Either vacate the Project decision or enjoin implementation of the Project;

C. Award Plaintiffs their costs, expenses, expert witness fees, and reasonable attorney fees under EAJA; and

D. Grant Plaintiffs any such further relief as may be just, proper, and equitable.


Respectfully submitted this 9th Day of September, 2024.


*/s/ Rebecca K. Smith*
Rebecca K. Smith
PUBLIC INTEREST DEFENSE CENTER, PC

Attorney for Plaintiffs