IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| ALLIANCE FOR THE WILD ROCKIES, and NATIVE ECOSYSTEMS COUNCIL, | CV 24–125-M-KLD |
| Plaintiffs, | |
| vs. | ORDER |
| MATT ANDERSON, Supervisor Bitterroot National Forest; TROY HEITHECKER, Acting Regional Forester, U.S. Forest Service Northern Region; U.S., FOREST SERVICE,[1] | |
| Defendants. | |

Plaintiffs Alliance for the Wild Rockies and Native Ecosystems Council

bring this action against the United States Forest Service ("USFS"); Matt

Anderson, in his official capacity as Supervisor for the Bitterroot National Forest;

and Troy Heithecker, in his official capacity as Acting Regional Forester for USFS

Northern Region. Plaintiffs challenge the approval of the Gold Butterfly Project

("Project") in the Bitterroot National Forest ("Forest"). Plaintiffs' first amended

complaint alleges that Federal Defendants' approval of the Project violated the

National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4331 et seq.; the

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), the current public officers are substituted for their predecessors as named Defendants.

1

Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq.; the National Forest

Management Act ("NFMA"), 16 U.S.C. § 1600 et seq.; the 2012 NFMA planning

regulations ("2012 Planning Rule), 36 C.F.R. § 219.1 et seq.; and the Healthy

Forest Restoration Act ("HFRA"), 16 U.S.C § 6591 et seq. (Doc. 9).

This matter comes before the Court on Plaintiffs' motion for summary

judgment (Doc. 15), Defendants' cross-motion for summary judgment (Doc. 21),

and Defendants' motion to complete the administrative record (Doc. 26). The

Court heard oral argument on the pending motions on January 15, 2026. As set

forth below, the parties' cross-motions for summary judgment are granted in part

and denied in part. Likewise, Defendants' motion to complete the administrative

record is granted in part and denied in part.

## I.    Background

The Project area consists of 55,147 acres located in the Sapphire Mountains

on the Bitterroot National Forest ("Forest"). (FS011284). [2] The Project is located

within Ravalli County and to the east of Corvallis, Montana. (FS011284).

Implementation of the Project will occur over an 8-year period. (FS011307). The

stated purposes of the Project include "improv[ing] landscape resilience to insect

and disease," "improv[ing] landscape resilience to wildfire," "provid[ing] timber

---

[2] Citations to the administrative record will consist of an "FS" prefix and the bates page number.

products and related jobs," "reduc[ing] chronic sediment sources in the Willow Creek watershed," and "restor[ing] or improv[ing] key habitats." (FS011287).

The Project authorizes vegetation treatments throughout the Project area. Authorized treatments include 5,281 acres of "commercial harvest treatments," which may involve "clearcutting lodgepole, commercial thinning, improvement cutting, sanitation harvest and other treatments." (FS011292). Authorized treatments also include 2,084 acres of "non-commercial treatments," which may involve "maintenance burning, meadow restoration, mechanical fuels treatment, stand-improvement thinning and whitebark pine restoration." (FS011292).

The Project also authorizes road construction and decommissioning. Road construction will involve "approximately 6.4 miles of permanent road and 17.3 miles of temporary road . . . ." (FS011293). Decommissioning will encompass "approximately 22.3 miles of roads that are no longer needed for future management, and 21.3 miles of Intermittent Stored Service (storage) roads" and "16.5 miles of non-system (undetermined) roads." (FS011293).

The Bitterroot National Forest operates under the 1987 Forest Plan ("Forest Plan"), which guides natural resource management activities and establishes management standards for the Forest. (FS000900). The Project includes a site-specific amendment to the Forest Plan. (FS011331-33). The Project-specific amendment first sets aside the Forest Plan standard for "Elk Habitat

Effectiveness." (FS011331). Likewise, the amendment sets aside the plan standard regarding thermal cover for elk habitat. (FS011331). Finally, the Project-specific amendment modifies the forest-wide standard for old-growth stand conditions. (FS011332).

USFS issued a scoping letter for the Project in June 2017 (FS009497), and thereafter issued a Draft EIS in June 2018. (FS009490). A Final EIS was issued in March 2019. (FS011286). However, a revised Final EIS was issued in October 2019. (FS010455). Accordingly, the Project Record of Decision was signed in November 2019. (FS011286).

In August 2020, the Forest Supervisor for the Bitterroot National Forest withdrew the Project and instructed USFS staff to conduct additional review and analysis. (FS011286). USFS then issued a Draft Supplemental EIS in June 2021 and the Final Supplemental EIS and Draft Record of Decision in December 2021. (FS011286). However, the Final Supplemental EIS was updated in February 2023. (FS011286). Finally, the Record of Decision was signed in August 2023. (FS011311).

As part of the Project's NEPA analysis, the Wildlife Specialist Report addresses the "direct, indirect, and cumulative impacts on endangered, threatened and sensitive wildlife species . . . ." (FS020670). The Wildlife Specialist Report specifically considered effects of the Project on grizzly bear and wolverine.

(FS020705-12; FS020712-18). In light of new information regarding wolverine and grizzly bears that emerged after the Record of Decision was signed, USFS prepared a Supplemental Information Report ("SIR") in December 2024. (FS084879-5037).

Plaintiffs filed their complaint in this matter on September 9, 2024. (Doc. 1). Subsequently, Plaintiffs filed an amended complaint on November 26, 2024. (Doc. 9). The parties thereafter filed the instant cross-motions for summary judgment (Docs. 15, 21) on March 13, 2025 and April 17, 2025, respectively. Defendants also filed the instant motion to complete the administrative record on April 17, 2025. (Doc. 26). The motions are fully briefed and ripe for ruling.

## II.    Legal Standards

### a.    NEPA

NEPA is a procedural statute requiring government agencies to "take a hard look" at the "environmental consequences" of their actions. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). An agency adequately conducts a "hard look" "by providing a reasonably thorough discussion of the significant aspects of the probable environmental consequences" of a proposed action. *Center for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1194 (9th Cir. 2008) (quoting *Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146, 1149 (9th Cir. 1998)). NEPA "does not mandate particular results," but "prescribes

the necessary process" agencies must follow to identify and evaluate "adverse environmental effects of the proposed action." *Robertson*, 490 U.S. at 350. The court's review is complete if upon review of the record the court is satisfied the agency took a "hard look" at the proposed action's environmental impacts. *Idaho Conservation League v. Mumma*, 965 F.2d 1508, 1519 (9th Cir. 1992). "[T]he central principle of judicial review in NEPA cases is deference." *Seven Cnty. Infrastructure Coalition v. Eagle Cnty., Colorado,* 145 S. Ct. 1497, 1511 (2025).

    b.    **NFMA**

NFMA provides a two-tiered approach for forest planning and management. *2-Bar Ranch Limited Partnership v. United States Forest Service*, 996 F.3d 984, 986 (9th Cir. 2021). The first tier involves planning at the forest level through USFS' development of a forest plan. *2-Bar Ranch Limited Partnership*, 996 F.3d at 986. "Forest plans are broad, programmatic documents that 'guide sustainable, integrated . . . management of the resources within the plan area in the context of the broader landscape.'" *2-Bar Ranch Limited Partnership*, 996 F.3d at 986 (quoting 36 C.F.R. § 219.1(b)). The second tier involves implementation of the forest plan to individual site-specific projects, which "must be consistent with the forest plan." *2-Bar Ranch Limited Partnership*, 996 F.3d at 986 (internal quotations omitted); 16 U.S.C. § 1604(i).

"It is well-settled that [USFS'] failure to comply with the provisions of a Forest Plan is a violation of NFMA." *Native Ecosystems Council v. U.S. Forest Service*, 418 F.3d 953, 961 (9th Cir. 2005). USFS must show that a project it undertakes complies with the governing forest plan. *Native Ecosystems Council*, 418 F.3d at 961 (citing 16 U.S.C. § 1604(i)). "A project is consistent if it conforms to the applicable 'components' of the forest plan, including the standards, guidelines, and desired conditions that are set forth in the forest plan and that collectively establish the details of forest management." *Alliance for the Wild Rockies v. United States Forest Service*, 907 F.3d 1105, 1110 (9th Cir. 2018). The Court will award "substantial deference" to "[USFS'] interpretation and implementation of its own forest plan." *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1056 (9th Cir. 2012).

  c.  **HFRA**

The purposes of HFRA include the reduction of "wildfire risk to communities, municipal water supplies, and other at-risk Federal land through a collaborative process of planning, prioritizing, and implementing hazardous fuel reduction projects" as well as the enhancement of "efforts to protect watersheds and address threats to forest and rangeland health, including catastrophic wildfire, across the landscape." 16 U.S.C. § 6501(1), (3). "[T]he Forest Service is required 'as soon as practicable' to implement an 'authorized hazardous fuel reduction

project' on federal land where 'the existence of an epidemic of disease or insects, or the presence of such an epidemic on immediately adjacent land and the imminent risk it will spread, poses a significant threat to an ecosystem component, or forest or rangeland resource.'" *WildWest Inst. v. Bull*, 547 F.3d 1162, 1165 (9th Cir. 2008) (quoting 16 U.S.C. § 6512(a)(4)) (alterations omitted).

In addition to other requirements, hazardous fuel reduction projects authorized under HFRA must be "conducted consistent with the resource management plan and other relevant administrative policies or decisions applicable to the Federal land covered by project." 16 U.S.C. § 6512(b). HFRA further requires "forest health projects to 'maximize[ ] the retention of old-growth and large trees, as appropriate for the forest type, to the extent that the trees promote stands that are resilient to insects and disease.'" *All. for the Wild Rockies v. Marten*, 464 F. Supp. 3d 1169, 1176 (D. Mont. 2020) (quoting 16. U.S.C §§ 6591a(e), 6591b(b)(1)(A)).

### d.    Summary Judgment

Courts review agency decisions under NFMA, NEPA, and HFRA by applying the standard of review set forth in the APA. *Center for Biological Diversity v. Zinke*, 868 F.3d 1054, 1058 (9th Cir. 2017); *Gifford Pinchot Task Force v. U.S. Fish and Wildlife Service*, 378 F.3d at 1065; *Native Ecosys. Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1238 (9th Cir. 2005). The Rule 56 summary

judgment standard is therefore modified in cases requiring review of an administrative record pursuant to the APA; courts are required to uphold agency actions unless they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[,]" or "without observance of procedure required by law." *Center for Biological Diversity*, 868 F.3d at 1057; 5 U.S.C. § 706(2)(A); 5 U.S.C. § 706(2)(D).

The APA standard of review is deferential. A decision is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). An agency action likewise is arbitrary and capricious if the agency fails to articulate a satisfactory explanation for its action, including a rational connection between the facts found and the choice made. *Motor Vehicle Mfrs.*, 463 U.S. at 43. A court may not accept an agency's post hoc rationalizations for its action. *Motor Vehicle Mfrs.*, 463 U.S. at 50. "It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Motor Vehicle Mfrs.*, 463 U.S. at 50.

9

### III.    Completion or Supplementation of the Record

Having filed an additional 28 documents with the Court, Defendants now seek leave to "complete" the administrative record with those documents. (Doc. 26). In support of their motion, Defendants have filed a Third Declaration of Emmet Pruss, which describes the documents, provides some context for their inclusion, and certifies that the additional documents were "directly or indirectly considered by the Forest Service in connection with the Project decision." (Doc. 27-1 at 3). Plaintiffs oppose the motion, arguing that the request is untimely, does not satisfy the requirements for supplementing an administrative record, and encompasses post-decisional documents.

The court's review of an agency action is generally limited to the administrative record. 5 U.S.C. § 706. Administrative review accordingly disfavors consideration of extra-record evidence. *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985) ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court"). Indeed, "[w]hen a reviewing court considers evidence that was not before the agency, it inevitably leads the reviewing court to substitute its judgment for that of the agency." *Asarco, Inc. v. U.S. Envtl. Prot. Agency*, 616 F.2d 1153, 1160 (9th Cir. 1980).

As a threshold matter, the parties disagree as to which standard the Court should apply to determine whether the additional documents can become part of the record in this case. For their part, Defendants cite several cases that distinguish "completing the record" from "supplementing the record." For instance, in *Bruce v. Azar*, the United States District Court for the Northern District of California held that "'completing the record' refers to including 'materials which were actually considered by the agency, yet omitted from the administrative record, whereas 'supplementing the record' refers to including 'materials which were not considered by the agency, but which are necessary for the court to conduct a substantial inquiry.'" *Bruce v. Azar,* 389 F. Supp. 3d 716, 724 n.5 (N.D. Cal. 2019) (quoting *Ctr. For Native Ecosystems v. Salazar*, 711 F. Supp. 2d 1267, 1274 (D. Colo. 2010)).

In contrast, Plaintiffs argue that the administrative record can only be supplemented according to precedent set forth in *Lands Council v. Powell*. 395 F.3d 1019, 1030 (9th Cir. 2005). In that case, the Ninth Circuit recognized four "narrow exceptions" to the general rule prohibiting extra-record evidence: (1) when supplementation is necessary to determine whether the agency has considered all factors and explained its decision; (2) when the agency relied on documents not in the record; (3) to explain or clarify technical matters or complex

subjects; and (4) where plaintiffs make a strong showing of agency bad faith. *Lands Council v. Powell*, 395 F.3d at 1030.

Although the tests for admission might differ, the two standards advanced by the parties nevertheless overlap to some degree. Documents which "complete the record" because they "were actually considered by the agency" might very well also "supplement the record" because the agency the agency "relied on" those documents under the second *Lands Council* exception. *Bruce,* 389 F. Supp. 3d at 724 n.5; *Lands Council,* 395 F.3d at 1030. This is precisely the case for most of the documents that Defendants seek to add to the administrative record. The declaration submitted along with Defendants' motion is sufficient to establish that USFS considered or otherwise relied on the additional documents, with three exceptions.

Among the 28 documents submitted by Defendants, three do not merit inclusion with the administrative record. As Plaintiffs point out, three spreadsheets are dated after the Record of Decision was signed. These spreadsheets summarize monitoring data related to pine marten and pileated woodpecker, and are found in the record at FS085194-95; FS085196-204; and FS085343. One spreadsheet, detailing pine marten data, was not only compiled after the Project decision, but also contains data that post-dates the decision. (FS085194). Because these documents were compiled after the Project Record of Decision was signed, they

cannot have been considered or relied on by USFS and therefore meet neither standard for inclusion in the administrative record. Accordingly, the Court denies the request to admit these three documents, but approves the request to complete or supplement the record with the remaining 25 documents.

## IV.   Summary Judgment Claims

### a.   Project-Specific Amendment

Plaintiffs first argue that the Project-specific amendment was improperly authorized. This argument involves claims that USFS' NEPA analysis regarding the amendment was inadequate. Plaintiffs further allege that the Project-specific amendment, considered in the contest of similar amendments, should be considered "significant' under NFMA and NEPA. That significance finding, Plaintiffs allege, merits Forest-wide analysis. Finally, Plaintiffs argue that the site-specific amendment violated the 2012 Planning Rule and NFMA. With regard to these arguments and as explained below, the Court finds no violation of NEPA, NFMA, or the 2012 Planning Rule.

#### 1.   Article III Standing

As an initial matter, Defendants assert Plaintiffs lack Article III standing on their claims regarding the Project-Specific amendment. Therefore, Defendants argue, the Court lacks jurisdiction over these claims and need not reach the merits of Plaintiffs' arguments on this issue. Defendants explain that "[v]acatur of the

Project-specific Amendment would not affect the operative standards for elk

habitat or old growth on the Forest because the same amendments were adopted

Forest-wide in September 2023." (Doc. 22 at 15).

Article III standing requires that a party's injury must be "concrete,

particularized, and actual or imminent; fairly traceable to the challenged action;

and redressable by a favorable ruling." *Clapper v. Amnesty International USA*, 568

U.S. 398, 409 (2013) (quoting *Monsanto Co. v. Geertson Seed Fars*, 561 U.S. 139,

149 (2010)).

Applying this precedent, Defendants contend that even if Plaintiffs won a

favorable ruling on their claims regarding the site-specific amendment, they would

find no redress for their alleged injury. Defendants have filed a declaration

indicating that, following Project approval, USFS implemented programmatic

(Forest-wide) amendments to the Forest Plan. (Docs. 24, 24-1). The standards

included in the Project-specific amendment (challenged by Plaintiffs) appear to be

reflected in the programmatic amendment.

Plaintiffs do not dispute that the contents of the site-specific amendment are

mirrored in the programmatic amendment. Nor do Plaintiffs' challenge the

programmatic amendment itself. Instead, Plaintiffs argue "[i]f the Forest Service

chooses to apply the new amendments on remand in this case, then Plaintiffs

would challenge the legality of the new amendments at that time." (Doc. 32 at 21-

22). In support of this argument, Plaintiffs cite to *Native Ecosystems Council v. Tidwell* for the proposition that "the Forest Service is required to comply with the . . . forest plan in place at the time of its decision." (Doc. 32 at 21) (quoting *Native Ecosystems Council v. Tidwell*, 599 F.3d 926, 932 n. 8). On reply, Defendants point out that "Plaintiffs' response addresses a project's substantive compliance with a forest plan as required by NFMA, not a litigant's Article III standing to challenge a project in the first instance." (Doc. 35 at 4). Defendants further point out that the programmatic amendment was adopted "more than a year before Plaintiffs initiated this action." (Doc. 35 at 4).

At oral argument, Plaintiffs offered additional explanation that better explains their position. Plaintiffs stated that, in the event that the Project was vacated or remanded, Defendants would be required to comply with the terms of the programmatic amendment in preparing new Project documents. While the programmatic amendment does establish the same old-growth and elk-focused changes that are written into the Project-specific amendment, the programmatic amendment also includes significant *additional* changes to the Forest Plan. (*See* Doc. 24-1 at 11-24).

Considering these additional requirements, there is a possibility that, following remand or vacatur, a new iteration of the Project, issued in compliance with all terms of the programmatic amendment, would perhaps result in a project

15

with which Plaintiffs would take no issue. That possibility is sufficient to fulfill the redressability requirement of Article III standing.

Under Ninth Circuit precedent "[p]laintiffs alleging procedural injury 'must show only that they have a procedural right that, if exercised *could* protect their concrete interests.'" *Salmon Spawning & Recovery Alliance v. Guttierrez*, 545 F.3d 1220, 1226 (9th Cir. 2008) (quoting *Defenders of Wildlife v. U.S. EPA, 420 F.3d 946 , 957 (9h Cir. 2005).* Similarly, the Supreme Court has held that "[w]hen a litigant is vested with a procedural right, that litigant has standing if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." *Massachusetts v. EPA,* 549 U.S. 497, 518 (2007).

In this case, Plaintiffs have shown that a reconsidered and resubmitted Project would be subject to additional requirements under the programmatic amendment. Defendants would therefore be required to reconsider the Project, and perhaps implement the Project differently. Accordingly, the Article III redressability requirement has been satisfied and the Court will consider the merits of Plaintiffs' claims regarding the Project-specific amendment.

### 2.    Amendment NEPA Claims

Plaintiffs make three primary arguments concerning USFS' NEPA analysis for the Project-specific amendment. First, Plaintiffs allege the EIS prepared for the

amendment failed to consider an adequate number of alternatives, in violation of NEPA. Second, Plaintiffs allege that the cumulative effects analysis for the amendment did not include sufficient information regarding similar site-specific amendments, in violation of NEPA. Third, Plaintiffs argue USFS failed to assess the Project-specific amendment as a "significant forest plan amendment," in violation of NFMA.

Plaintiffs filed their motion for summary judgment in this matter on March 13, 2025. (Docs. 15). The final brief on summary judgment was filed on June 11, 2025. (Doc. 25). Between those dates, the Supreme Court handed down its decision in *Seven County Infrastructure Coalition v. Eagle County*. 605 U.S. 168 (2025).

Announcing a "course correction of sorts" for NEPA litigation, the *Seven County* decision describes a limited judicial role in "policing NEPA compliance." *Seven County,* 605 U.S. at 184; *Cascadia Wildlands v. U.S. Bureau of Land Mgt.*, 153 F.4th 869, 903 (9th Cir. 2025) (citing *Seven County,* 605 U.S. at 185). Accordingly, when reviewing an agency's NEPA analysis "[c]ourts should afford substantial deference and should not micromanage those agency choices so long as they fall within a broad zone of reasonableness." *Seven County*, 605 U.S. at 183.

That substantial deference extends even to instances where a court may disagree with the agency's determination of how to limit its NEPA analysis.

17

"[E]ven if the reviewing court . . . might think that NEPA would support drawing a different line, a court should defer to an agency so long as the agency drew a reasonable and 'manageable line.'" *Seven County*, 605 U.S. at 191 (citations omitted). The issue of remedy is also encompassed by the Court's realignment regarding NEPA adjudication. "[E]ven if the [agency's NEPA analysis] drew the line on the effects of separate upstream or downstream projects too narrowly, that mistake would not necessarily require a court to vacate the agency's approval of the . . . project." *Seven County*, 605 U.S. at 185. This new and binding precedent weighs heavily on the adjudication of Plaintiffs' NEPA claims.

### A.    Alternatives Analyzed

Plaintiffs argue that that, in preparing the EIS for the amendment, USFS failed to analyze a "reasonable range of alternatives." (Doc. 19 at 13). Plaintiffs cite to the Ninth Circuit's decision in *Alaska Wilderness Recreation & Tourism Association v. Morrison* for the proposition that "[t]he existence of a viable but unexamined alternative renders an environmental impact statement inadequate." 67 F.3d 723, 729 (9th Cir. 1995) (citation omitted).

Plaintiffs point out that the EIS for the amendment only analyzed a no-action alternative and an action alternative involving implementation of the amendment. (Doc. 16 at 14). Plaintiffs compare these facts to *Alliance for the Wild Rockies v. Marten*, where, in the context of a site-specific forest plan amendment, a court in

18

this district found that analyzing only the action alternative and a no-action alternative was inadequate under NEPA. *All. for the Wild Rockies v. Marten,* 585 F.Supp.3d 1252, 1275 (D. Mont. 2021).

Defendants respond by highlighting the requirements of USFS' NEPA regulations. (Doc. 22 at 16). Specifically, 36 C.F.R § 220.5(e) establishes that "no specific number of alternatives is required or prescribed." In light of that regulatory language, Plaintiffs have at least failed to show a violation of USFS' internal NEPA regulations.

Defendants further respond by arguing that Plaintiffs fail to "identify a viable but unexamined alternative in either their brief or nearly 10,000 pages of objections and attachments." (Doc. 22 at 17). According to Defendants, this omission distinguishes this matter from *Marten*, because in that case, the plaintiffs had plainly identified a viable but unexamined alternative. *Marten*, 585 F.Supp.3d at 1275. Plaintiffs' counter that the "adoption of the Hillis elk security method as a replacement Forest Plan standard" constitutes a viable, but unexamined alternative. (Doc. 32 at 6). However, Defendants respond that Plaintiffs did not raise this standard as a viable alternative at the appropriate stage in litigation. (Doc. 45 at 5).

Ultimately the Court need not determine whether Hillis was appropriately proposed by Plaintiffs. Even if Hillis was raised at the appropriate time, the deference owed to USFS' determination under *Seven County* would control.

19

> When assessing . . . feasible alternatives . . . an agency will invariably make a series of fact-dependent, context-specific, and policy-laden choices about the depth and breadth of its inquiry . . . . Courts should afford substantial deference and should not micromanage those agency choices so long as they fall within a broad zone of reasonableness.

*Seven County,* 605 U.S. at 182–83. In this case, three additional alternatives were considered but eliminated from detailed study. (FS010873-74). The agency's determination that the no-action and action alternatives constituted an appropriate range of alternatives falls within a "broad zone of reasonableness" and satisfied the requirements of NEPA. *Seven County,* 605 U.S. at 182–83.

### B.    Similar Amendments

Plaintiffs next argue that the cumulative effects analysis for the site-specific amendment was deficient under NEPA because it lacked "quantified, detailed information about past, present, and reasonably foreseeable similar amendments." (Doc. 16 at 14). While Plaintiffs acknowledge that other amendments are mentioned in Project documents, Plaintiffs maintain that those references are inadequate to satisfy the requirements for cumulative effects analysis under NEPA.

A cumulative effect or impact "is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions …." *Te-Moak Tribe of W. Shoshone of Nevada v. U.S. Dep't. of the Interior*, 608 F.3d 592, 603 (9th Cir. 2010) (citing 40 C.F.R. § 1508.7). "General statements about 'possible effects' and 'some risk' do

20

not constitute a 'hard look' absent a justification regarding why a more definitive information could not be provided." *Te-Moak Tribe*, 395 F.3d at 1028. To prevail on a cumulative effects claim, environmental plaintiffs "need not show what impacts would occur. To hold otherwise would require the public, rather than the agency, to ascertain the cumulative effects of a proposed action." *Te-Moak*, 608 F.3d at 605.

The issue of additional, site-specific amendments is addressed in the Final Supplemental EIS. Addressing cumulative effects on wildlife, the Final Supplemental EIS states that the Project-specific amendment

> would not result in negative cumulative effects to pileated woodpecker or marten when considering the effects of the recent Mud Creek project-specific amendment, and the foreseeable Bitterroot Front project-specific amendment and the Forest-wide programmatic amendment.

(FS010888).

Similarly, Appendix D to the original Project Record of Decision addresses "cumulative effects" related to "10 project-specific amendments (one more anticipated with reasonably foreseeable projects . . . ) . . . related to [Elk Habitat Effectiveness] since the Forest Plan was approved in 1987" as well as "7 project-specific amendments related to thermal and hiding cover." (FS001757)

Considered together, these references demonstrate that USFS generally considered and addressed the cumulative effects regarding other, similar project-

21

specific amendments. While Plaintiffs may desire additional analysis, Defendants have demonstrated that USFS drew a "manageable line" in determining how much depth of analysis to afford and how much detail to include. *Seven County*, 605 U.S. at 191. USFS' conclusion is further supported by analysis focusing on existing conditions. For instance, the Project silviculture report quantifies past timber harvest in the Project area and so, in some form, represents the effects of past projects that included site-specific amendments. (FS018334).

### C.    De facto Significant Amendment

Plaintiffs next argue that by incorporating similar and "successive, site specific amendments" into various projects, USFS has effectively implemented a "*de facto* significant" amendment to the Forest Plan. (Doc. 16 at 16-17). Accordingly, Plaintiffs argue, USFS is obligated to conduct Forest-wide analysis regarding the effects of those successive amendments. (Doc. 16 at 17).

In part, Plaintiffs rest their argument on language found in 16 U.S.C. § 1604. That statutory section describes requirements for "National Forest System land and resource management plans." 16 U.S.C. § 1604. Plaintiffs call particular attention to § 1604(f)(4), which indicates:

> Plans developed in accordance with this section shall . . . be amended in any manner whatsoever after final adoption after public notice and, if such amendment would result in a significant change in such a plan, in accordance with the provisions of subsections (e) and (f) of this section and public involvement comparable to that required by subsection (d) of this section . . . .

16 U.S.C. § 1604(f)(4).

Plaintiffs also call attention to *Alliance for the Wild Rockies v. Marten*, where the plaintiffs similarly argued that successive, site-specific forest-plan amendments in separate projects amounted to a "*de facto* significant Forest Plan Amendment that must be analyzed in a full EIS." *Marten*, 585 F.Supp.3d at 1277. In that case, the Court reasoned that the plaintiffs' arguments had merit. *Marten*, 585 F.Supp.3d at 127.

However, the *Marten* decision emerged from a different regulatory context. Critically, that decision operated in an environment where "any Forest Plan amendment that would result in a 'significant change' in the plan requires the preparation of an EIS." *Marten*, 585 F.Supp.3d at 1277. (citing *Native Ecosystems Council,* 304 F.3d at 898 and 36 C.F.R § 219.10(f) (1982)). As Defendants point out, the *Marten* decision addressed a forest plan amendment completed under regulatory framework preceding the 2012 Planning Rule.

The 2012 Planning Rule includes a requirement regarding the analysis required for proposed forest plan amendments. In general

> a proposed amendment that may create a significant environmental effect and thus requires preparation of an environmental impact statement is considered a significant change in the plan for the purposes of NFMA and therefore requires a 90-day comment period for the proposed plan and draft environmental impact statement . . . .

36 C.F.R.§ 219.13(b)(3) (2017). However, this general rule is in effect "[e]xcept for an amendment that applies only to one project or activity . . . ." 36 C.F.R.§ 219.13(b)(3) (2017). This is the case for the Project-specific amendment in question.

Plaintiffs argue that the single-project exception under § 219.13(b)(3) does not *preclude* the analysis required for significant amendments, but rather that it simply exempts site-specific amendments from a per se finding of significance. Accepting that as accurate, the Court nevertheless finds that Plaintiffs' arguments on this issue are unpersuasive. Plaintiffs have pointed to no violation of USFS' obligations under 16 U.S.C. § 1604(f)(4) or 36 C.F.R.§ 219.13(b)(3). Nor have they established the need for more analysis regarding the impact of successive, site-specific amendments. In light of the significant deference afforded USFS under *Seven County*, the Court finds that the agency reasonably assessed the significance of the site-specific amendment and concluded that no further analysis was necessary.

### 3.    2012 Planning Rule

Plaintiffs next allege that the site-specific amendment failed to replace species protections with more robust protections, in violation of the 2012 Planning Rule. Plaintiffs further allege that, in promulgating the Project-specific

amendment, USFS failed to satisfy the 2012 Planning Rule's best available science requirement.

The 2012 Planning Rule dictates the substantive requirements that must be incorporated into every forest plan. 36 C.F.R § 219.7. When amending a Forest Plan, USFS must "[d]etermine which specific substantive requirement(s) . . . are directly related to the plan direction being added, modified, or removed by the amendment and apply such requirement(s) within the scope and scale of the amendment." 36 C.F.R. §219.13(b)(5).

The 2012 Planning Rule also requires the use of best available science in planning, and further requires that the documentation supporting a decision "identify what information was determined to be the best available scientific information, explain the basis for that determination, and explain how the information was applied to the issues considered."  36 C.F.R. § 219.3. Pursuant to these requirements, Plaintiffs' argument comes in three parts.

Plaintiffs first allege that the amendment fails to comply with substantive requirements from the Planning Rule encompassing pine marten and pileated woodpecker. (Doc. 16 at 18-19). Plaintiffs rest this argument on the substantive requirement that Forest Plans must include components (such as standards, objectives, and guidelines) "to maintain or restore . . . [r]are aquatic and terrestrial plant and animal communities." 36 C.F.R. § 219.9(a)(2). According to Plaintiffs,

25

the Project's impacts to habitat for pine marten and pileated woodpecker violate this substantive requirement.

Plaintiffs second allege that the amendment fails to comply with the requirements of 36 C.F.R. 219.10(a)(10). That regulatory section addresses the requirements for "developing plan components for integrated resource management" and instructs the agency to consider "[h]abitat conditions . . . for wildlife, fish, and plants commonly enjoyed and used by the public; for hunting, fishing, trapping, gathering, observing, subsistence, and other activities . . . ." 36 C.F.R. 219.10(a)(5). Plaintiffs point to citations in the record to support the propositions that (1) the Project will negatively impact elk habitat and (2) "likely force the elk of the National Forest lands and down into the valley onto private lands that do not allow public hunting." (Doc. 16 at 19).

Finally, Plaintiffs allege

> [t]he Amendment does not include the scientifically-based standards or guidelines to ensure that there is an adequate amount of elk security maintained in the Project area to ensure public hunting opportunity, or an adequate amount/quality/distribution of pine marten and piliated woodpecker habitat maintained in the Project area to ensure a viable population of both.

(Doc. 16 at 19-20). This statement captures the extent of Plaintiffs' arguments regarding the 2012 Planning Rule's best available science requirements.

In response, Defendants argue USFS fully considered the substantive requirements of the 2012 Planning rule. (Doc. 22 at 21). The analysis supporting

26

that conclusion is found in Appendix B to the Project Final Record of Decision. (FS011334-35). Pursuant to 36 C.F.R. 219.13(b)(5), the agency identified the substantive requirements that were directly related to the amendment.

Regarding old growth, USFS determined that the requirements of § 219.8(a)(1)(iv) and § 219.9(a)(2) were directly applicable. The agency further concluded that the amendment complies with the conditions of these requirements. (FS011334). Regarding elk habitat effectiveness and thermal cover, the agency determined that the requirements of § 219.10(a)(5) were directly applicable. Again, the agency found that the amendment complies with the conditions of that regulatory section. (FS011335).

USFS also clarified that this analysis was conducted using the best available science. "The removal and modification of this set of plan standards aligns management actions within the [Project] area with the best available scientific information as descried in Appendix D of the Final EIS . . . , the Final Supplemental EIS . . . , and Final Supplemental EIS Appendix B . . . ." (FS011335).

In light of this evidence, and lacking any further briefing on the issue from Plaintiffs, the Court concludes that the agency validly addressed and satisfied the requirements of 36 C.F.R. § 219.9(a)(2) and § 219.10(a)(5). Plaintiffs have failed to show a violation of the 2012 Planning Rule regarding those regulatory sections.

Further, Plaintiffs have not demonstrated a violation of the best available science requirement found at 36 C.F.R. § 219.3.

### b.    Old Growth Species

Plaintiffs next challenge USFS' practices related to the monitoring of old-growth indicator species—pine marten and pileated woodpecker. (Doc. 16 at 20). While the requirements for the monitoring of each species are established by the Forest Plan—rather than by the Project—Plaintiffs nevertheless contend that USFS' alleged deficiencies are sufficiently connected to the Project as to justify judicial review. (Doc. 16 at 22-23). Plaintiffs specifically allege that USFS' monitoring and reporting practices substantiate violations of NFMA and NEPA. For the reasons set out below, the Court finds that there is no jurisdiction to review Plaintiffs' monitoring NFMA claim and that the monitoring NEPA claim lacks merit. The Court will address each claim in turn.

### 1.    Monitoring NFMA Claim

The substance of Plaintiffs' NFMA monitoring claims focuses on Forest-wide Management Standard F.1.e.1 from the Forest Plan, which requires that

> [t]he amount and distribution of old growth will be used to ensure sufficient habitat for the maintenance of viable populations of existing native and desirable vertebrate species, including two indicator species, the pine marten and pileated woodpecker.

(FS000919). Plaintiffs' challenge focuses on USFS' implementation of measures to monitor pine marten and pileated woodpecker. Specifically, Plaintiffs indicate

that "[t]he mechanism created by the Forest Plan to ensure compliance with this standard is population trend monitoring of these two management indicator species." (Doc. 16 at 21) (citing FS001023). Plaintiffs argue that the population trend monitoring has not occurred as required.

To substantiate that argument, Plaintiffs point to requirements set out in a table of "Monitoring and Evaluation Requirements" in the Forest Plan that they claim establish the relevant monitoring requirements. The first column of the table sets out both "NFMA Requirement" and "Effects To Be Measured." (FS001023). Regarding pine marten, the table states that the effect to be measured shall be "population in relation to habitat changes." Similarly, the table indicates that the same "Effects To Be Measured" for pileated woodpecker. The rows for both species are listed as corresponding to the "NFMA Requirement" "36 CFR 219.19(6)." For both species, the table states that the "Data Source" is "Census;" the "Frequency of Measurement" is "3 transects annually;" and the "Reporting Period" is "Annually after 5-yr average is established." (FS001023).

Considering the information contained in this table of monitoring and evaluation requirements, Plaintiffs argue USFS has failed to meet the prescribed duties for both species. To substantiate the claim regarding pine marten monitoring, Plaintiffs point to USFS' Biennial Monitoring Evaluation Report for the Bitterroot National Forest. (FS006293-465). That report indicates that "[t]he

29

Forest rarely came close to completing the number of transects . . . ." (FS006323).

Further, "[t]he Forest began using a different monitoring methodology in 2014 by

establishing multi-carnivore bait stations at approximately 50 sites each winter."

(FS006323). In light of the discontinued practice of using transects to monitor for

pine marten, Plaintiffs contend that USFS never completed the required

monitoring, in violation of the standards set forth in the Forest Plan.

Regarding pileated woodpecker, Plaintiffs aver the record indicates that

monitoring data for pileated woodpecker populations was last collected in 2017.

(Doc. 16 at 22). The same Biennial Monitoring Report states:

> The [Bitterroot National Forest] has run pileated woodpecker
> monitoring routes on established transects most years from 1989
> through 2017. Lack of personnel to run the transects limited our
> ability to collect this data in 2018-2020.

(FS006327).

Plaintiffs' briefing implicitly acknowledges that the monitoring practices in

question are *not* authorized by the Project. Rather, the practices are Forest-wide.

However, Plaintiffs argue, Ninth Circuit precedent allows for challenges to Forest-

wide management practices where those practices are implicated in a challenge to

a final, site-specific action. In this case, Plaintiffs allege that the site-specific action

is the Project and the Forest-wide practice is the monitoring.

In response, Defendants (1) challenge the substance of Plaintiffs' monitoring

claim and (2) argue that, because there is an inadequate nexus between the site-

specific action and Forest-wide practice, the Court lacks jurisdiction over Plaintiffs' monitoring claims. As explained below, the Court finds that Plaintiffs have not established a sufficient connection between the lawfulness of the Project and USFS' monitoring of pine marten and pileated woodpecker. Therefore, the Court does not have jurisdiction to consider Forest-wide monitoring practices and need not reach the merits of Plaintiffs' monitoring claims.

Regarding jurisdiction over the monitoring claims, Plaintiffs' primary support comes by way of reference to the Ninth Circuit's opinion in *Neighbors of Cuddy Mountain v. Alexander,* 303 F.3d 1059 (9th Cir. 2002). There, the court considered whether the plaintiffs had adequately alleged a connection between forest-wide monitoring and viability for "old growth species" on the Payette National Forest. The court addressed the requirements that must be met to challenge a forest-wide practice. "Of course, not all forest-wide practices may be challenged on the coattails of a site-specific action; there must be a relationship between the lawfulness of the site-specific action and the practice challenged." *Neighbors*, 303 F.3d at 1067. Ultimately, the court found that, for the purposes of a Rule 12(b)(6) motion to dismiss, the plaintiffs had sufficiently connected to the

Project's violations of NFMA to the allegedly deficient old growth species monitoring.[3]

In support of a nexus between their challenge to the of lawfulness the Project and the Forest-wide monitoring practices, Plaintiffs highlight (1) a purported deficit of old growth, (2) project-related impacts to habitat for pine marten and pileated woodpecker, (3) the complications with species monitoring highlighted above, and (4) the allegedly declining trend for pileated woodpecker as documented in the Biennial report. Despite some factual similarities to *Neighbors of Cuddy Mountain*, Plaintiffs' allegations ultimately do not establish the requisite nexus between the Project and the Forest-wide monitoring practices.

In *Neighbors of Cuddy Mountain,* the Court specifically analyzed the connection between "the lawfulness of the site-specific action" and the forest-wide practice. There, the plaintiffs challenged the lawfulness of a timber sale, arguing that in approving the project, USFS was violating NFMA regulations and forest plan standards. According to the court, the forest-wide management practices were only reviewable to the extent they affected the lawfulness of the project. "[I]n order to win scrutiny of the Forest Service's forest-wide management practices,

---

[3] "Thus a fair reading of the complaint reveals allegations that the Forest Service's forest-wide failures to protect old growth habitat and species in accordance with NFMA and the Forest Plan render the approval of a specific mature growth timber sale . . . unlawful." *Neighbors of Cuddy Mountain*, 303 F.3d at 1068.

Neighbors must challenge a specific, final agency action, the lawfulness of which hinges on these practices." *Neighbors of Cuddy Mountain*, 303 F.3d at 1067.

The reviewability of forest-wide management practices requires something more than just alleging deficient monitoring of a species that will be impacted by a final agency action. Rather, there must be an independent basis to consider the lawfulness of the site-specific action, and that basis must require review of forest-wide practices. "[M]onitoring and management practices are reviewable when, and to the extent that, they affect the lawfulness of a particular final agency action." *Neighbors of Cuddy Mountain*, 303 F.3d at 1067 (citing *Lujan v. Natl. Wildlife Fedn.*, 497 U.S. 871, 894 (1990)).

At most, Plaintiffs can show that the Project will *impact* pine marten and pileated woodpecker.[4] But those impacts are limited in scope, and do not sustain a violation of USFS' species viability requirements. The Project will reduce pine marten and pileated woodpecker habitat by percentages that do not implicate viability across the Forest. (*See* FS020757; FS020777-79).

Plaintiffs' claim that a nexus exists is further undermined by the data that the agency has collected on both species in question. While it may or may not be the case that the data collection methods fail to comply with other requirements in the

---

[4] To this point, Plaintiffs cite to record documents addressing impacts to pine marten and woodpecker habitat; FS021478; FS022941.

Forest Plan, Defendants can nevertheless point to studies which generally show an increase in the number of pine marten detections and a stable number of pileated woodpecker detections across several years. (FS006424; FS006326-27). Whether this data complies with the monitoring requirements in the Forest Plan is a separate question. For the purpose of assessing a nexus between Plaintiffs' Project-specific and Forest-wide claims, the data supports the conclusion that there is no nexus.

For these reasons, the Court finds that Plaintiffs' NFMA-related challenges to the Project do not substantiate jurisdiction to review the Forest-wide monitoring of Pine Marten and Pileated Woodpecker.

### 2.    Monitoring NEPA Claim

Based on information in the Biennial Monitoring Report, Plaintiffs argue that the EIS presents misleading information to the public. Specifically, Plaintiffs argue that USFS "implies that population trends for pine marten and pileated woodpecker are stable or increasing . . . but in reality, there are no population trends for pine marten and the agency's monitoring report provides evidence that pileated woodpeckers could be declining." (Doc. 16 at 24). In essence, Plaintiffs allege that the Project Record of Decision misrepresents the contents of the Biennial Monitoring Report.

As cited by Plaintiffs, Appendix C to the Project Record of Decisions states:

Monitoring data for pine marten was last collected in 2020 and revealed that marten distribution and detections have trended

34

upwards. Monitoring data for pileated woodpecker was last updated in 2018 and pileated woodpecker detections have remained relatively stable. More information is available in the Bitterroot National Forest Biennial Monitoring and Evaluation Report which can be found on the Bitterroot National Forest Website

(FS011338).

Regarding pine marten, the Biennial Monitoring Report sets out data for bait station detections between 2013 and 2020, and discusses the aggregate conclusions that may be drawn from that data:

> Multi-carnivore bait station data have been collected since 2013 but have not been used previously in this forest to address monitoring plan questions. The percentage of bait station checks that detected at least one marten visit has generally trended upward from 2014 to present, with a rather large increase from 2016 to 2017. Reasons for this increase are not clear. We may be able to use the results to evaluate trends in marten populations, but these data do indicate that marten are widely distributed in suitable habitat across the Forest.

(FS006324) (emphasis omitted).

The Biennial Monitoring Report also sets out and discusses similar data for pileated woodpecker:

> The BNF has run pileated woodpecker monitoring routes on established transects most years from 1989 through 2017. Lack of personnel to run the transects limited our ability to collect this data in 2018-2020. The long-term average result through 2017 is about 0.21 pileated woodpecker detections per mile of transect. Our results for 2017 matched the long-term average and were an increase from the 0.16 pileated woodpecker detections per mile in 2016. The trend over time has been relatively consistent around this average but has fluctuated somewhat from year to year. Overall, the average number

35

of woodpeckers detected per mile of transect is slightly higher since 2010 than the average between 2000 and 2009.

Integrated Monitoring in Bird Conservation Regions (IMBCR) survey data from 2010-2018 (the most recent data currently available) indicates a slightly negative but non-significant trend in pileated woodpecker numbers on the entire BNF scale, the BNF in Montana scale and the scale of Bird Conservation Region 10 in Montana, which includes the Montana portion of the Northern Rockies BCR. This result appears to contradict the BNF results, but neither methodology has indicated substantial changes in population trends in either direction over that time.

(FS006327).

Comparing the cited content of the Record of Decision and Biennial Monitoring Report, the Court finds no significant discrepancies or contradictions. Although Plaintiffs state that USFS "implies that population trends for pine marten and pileated woodpecker are stable or increasing," the Record of Decision instead states that "marten distribution and detections have trended upwards." (Doc. 16 at 24) (FS011338; FS006323). The conclusion from the Record of Decision—that distribution and detections have trended upwards—is generally reflected in the contents of the Biennial Monitoring Report. Similarly, the contents of the Biennial Monitoring report related to pileated woodpecker are generally reflected in the Record of Decision. Accordingly, the Court finds nothing misleading in USFS' consideration of either species.

36

On reply, Plaintiffs further argue that, by applying a population trend calculation other than what was explicitly required by the Forest Plan, USFS violated NEPA's hard look requirement. (Doc. 32 at 15). In support of this argument, Plaintiffs paraphrase the Ninth Circuit's decision in *Native Ecosystems Council v. USFS*, 418 F.3d 953, 965 (9th Cir. 2005). That court held that the agency had violated NEPA when it failed to "disclose in the . . . project EIS that its [elk] hiding cover measurement was done over an improper (and as it now acknowledges, smaller) area." *Native Ecosystem Council v. USFS,* 418 F.3d at 964. As a result, the calculation for elk hiding cover was "arbitrarily and capriciously skewed" and the EIS that relied on that calculation "did not provide a full and fair discussion of the potential effects of the project on elk hiding cover." 418 F.3d at 965 (quotation omitted).

Without reaching the issue of whether USFS was or was not required to prepare the specific population trends that Plaintiffs seek, the Court finds the facts of this case are dissimilar to *Native Ecosystem Council v. USFS*. In that case, the agency's failure to apply a particular calculation resulted in a misleading conclusion, one which was not adequately explained in the EIS. In contrast, Plaintiffs' argument here merely alleges a NEPA violation based on purported noncompliance with a Forest Plan. Accordingly, the Court finds that Plaintiffs have

not demonstrated a resulting violation of NEPA because the EIS adequately discloses and discusses USFS' monitoring practices.

### c.     Elk Standard

Plaintiffs next challenge the Project's compliance with a "new elk standard." To establish a basis for a violation of this purported standard, Plaintiffs allege that, in promulgating the Project-specific amendment, USFS implemented a new standard in place of the requirements that the Project-specific amendment removed.

The terms of the alleged "new standard' come from Hillis et al (1991), a study that is cited in the NEPA documents related to the site-specific amendment. (*See* FS011335). That study advances the concept of "elk security," which describes geographic conditions necessary to understand and ensure elk survival on the landscape. (FS050900-05). The terms of the site-specific amendment removed standards related to "elk habitat effectiveness" and "thermal cover," which similarly address environmental conditions relevant to elk survival. Plaintiffs appear to argue that, because the Hillis "elk security" concept is described in documents which explain the site-specific amendment, that the concept was then imposed as new standard, in place of the requirements that were removed. Notably, the amendment does not explicitly state any such new standard. (FS011331).

Plaintiffs allege that, because USFS implicitly established or otherwise relied on elk security as a substitute standard, that that recommendations from the Hillis study are mandatory conditions that the Project must comply with. These conditions include the purported requirement that "blocks" which meet the conditions required for elk security must comprise 30% of the "analysis unit." Because the Project area does not contain 30% of secure "blocks," Plaintiffs allege that the Project does not satisfy the terms of the implicitly adopted Hillis elk security standard and therefore violates NFMA. (Doc. 16 at 26-27).

In the alternative, Plaintiffs argue that "the Forest Service relied on the Hillis security to standard to demonstrate compliance with the 2012 NFMA Planning Rule" and that it would be "arbitrary and capricious for the Forest Service to ignore [the standard] because both the draft EIS and final EIS discuss the Standard as if it was binding and claim that the Service developed the Project in compliance with its provisions." (Doc. 16 at 28) (paraphrasing *Ecology Center v. Austin*, 430 F.3d 1057, 1069-70 (9th Cir. 2005)).

As support for these arguments, Plaintiffs point to two passages in the record. First, Plaintiffs cite to Appendix D to the Forest Plan. This document falls under the heading "Plan Amendment and Consistency Discussion." (FS001753). In support of their arguments, Plaintiffs cite the following passage from Appendix D:

> The [elk habitat effectiveness] model described by Lyon was the best information available at the time the Plan was implemented.

> Subsequently, a model developed by Hillis et al. (1991) has been used in Bitterroot National Forest project planning to maintain elk security during hunting season when elk are most vulnerable.

(FS001754). The quoted passage appears in a table that lays out how the site-specific plan amendment meets the requirements of particular "Planning Regulation Sections." The table indicates that the Project must, and does, comply with 36 C.F.R. § 219.10(a)(5) as the applicable regulatory section.

In relevant part, § 219.10 instructs that forest plans "developed or revised under this part must provide for ecosystem services and multiple uses, including outdoor recreation, range, timber, watershed, wildlife, and fish, within Forest Service authority and the inherent capability of the plan area." 36 C.F.R. § 219.10. The means for accomplishing that requirement are set out in the subsections to the regulation, including as follows:

> (a)    Integrated resource management for multiple use. The plan must include plan components, including standards or guidelines, for integrated resource management to provide for ecosystem services and multiple uses in the plan area. When developing plan components for integrated resource management, to the extent relevant to the plan area and the public participation process and the requirements of §§ 219.7, 219.8, 219.9, and 219.11, the responsible official shall consider:
> . . .
> > (5)    Habitat conditions, subject to the requirements of § 219.9, for wildlife, fish, and plants commonly enjoyed and used by the public; for hunting, fishing, trapping, gathering, observing, subsistence, and other activities (in collaboration with federally recognized Tribes, Alaska Native Corporations, other Federal agencies, and State and local governments).

40

36 C.F.R. § 219.10.

The second passage cited by Plaintiffs also addresses compliance with § 219.10(a)(5). Specifically, Plaintiffs cite to Appendix B from the 2023 Project Final Record of Decision. The quoted passage falls under the heading "Determination and Application of Substantive Requirements," The document identifies § 219.10(a)(5) as a requirement that is "directly related" to the Project-specific amendment "based on its effects to habitat conditions for elk and other big game." (FS011335). Accordingly, the quoted passage states:

> I have applied this directly related provision through the addition of an elk security analysis (Hillis et al. 1991) to our environmental analysis protocol. This has proven to be a better tool than elk habitat effectiveness (EHE) analysis for achieving the Forest Plan objective to maintain elk populations and hunting season opportunities in cooperation with the Montana Department of Fish, Wildlife and Parks.

(FS011335). Although not quoted by Plaintiffs, the relevant paragraph continues:

> The increases in elk numbers, which is well distributed across the forest, appears to indicate that the elk population can tolerate the level of open road densities (and resulting EHE) that currently exist on the Bitterroot National Forest.

(FS011335). Read together, Plaintiffs allege that the cited passages are sufficient to demonstrate that USFS employed a Hillis elk security standard to demonstrate compliance with NFMA and must therefore be held to comply with the criteria set forth in the Hillis study.

41

In response, Federal Defendants argue that Plaintiffs have misread or misrepresented the agency's references to elk security. According to Defendants, the Hillis study does not impose not a new standard, but rather was simply a tool for analysis that itself supported compliance with NFMA planning requirements

To support their argument that USFS was arbitrary and capricious for having not complied with the terms of the purported new Hillis standard, Plaintiffs reference *Ecology Center, Inc. v. Austin* and *Native Ecosystem Council v. Weldon*. 430 F.3d 1057 (9th Cir. 2005); 848 F.Supp.2d. 1207 (D. Mont. 2012). In each of those cases, the defendant agency was found to have acted arbitrarily and capriciously when they substituted a new standard for a requirement they were obligated to fulfill under NFMA and, having done so, failed to meet requirements of the new standard. According to Plaintiffs, the facts of those cases are sufficiently close to USFS' approval of the Project to merit summary judgment on this issue.

However, both *Ecology Center, Inc. v. Austin* and *Native Ecosystems Council v. Weldon* can be distinguished from the matter at hand. In both cases, the agency failed to fulfill the requirements of standard it was required to meet. Here, Hillis is not such a standard. Rather, Hillis was apparently applied by USFS as a means to better understand and demonstrate the

impacts of the site-specific amendment. "I have applied this directly related provision through the addition of an elk security analysis (Hillis et al. 1991) to our environmental analysis protocol." (FS011335). Accordingly, Hillis was never implemented as a standard and the analogy to both cases referred to by Plaintiffs fails.

The parties also disagree as to whether certain aspects of Hillis constitute hard-and-fast rules or flexible recommendations. The Court need not reach the merits of this disagreement. USFS did not establish elk security as a standard for the Project. Nor did the agency rely on *compliance* with the terms of Hillis in the NEPA process. Therefore, the specifics of what Hillis might require or suggest are not relevant to the disposition of this issue.

### d.     "Low Level" Roads

Plaintiffs next challenge the Project's compliance with Forest-wide Management Standard F.1.e.13, which requires that "[t]he recommendations in the 'Coordinating Elk and Timber Management' report will be considered during timber management and transportation planning (Lyon, et al. 1985)." (FS000921). As referenced, the "Coordinating Elk and Timber Management Report" refers to the "Coordinating Elk and Timber Management Final Report of the Cooperative Elk-Logging Study." (FS055756). Plaintiffs add that the requirements of F.1.e.13 are further addressed in the record of decision for the Forest Plan, which states

"Recommendations from the 'Coordinating Elk and Timber Management' report . . . will be incorporated in project plans." (FS000863).

In light of this standard, Plaintiffs argue that the Project EIS "does not even disclose these recommendations, much less incorporate them into Project plans." (Doc. 16 at 30). In addition, Plaintiffs highlight a specific recommendation from the Coordinating Elk and Timber Management Report that they claim is particularly relevant to the Project's impacts: "Where maintenance of elk habitat quality and security is an important consideration, open road densities should be held to a low level, and every open road should be carefully evaluated to determine the possible consequences for elk." (FS055765).

Based on the content of this recommendation, Plaintiffs assert the existence of two specific shortcomings on behalf of the Project. First, Plaintiffs states that "every open road was not carefully evaluated." Second, Plaintiffs insist that that requirement that "open road densities should be held to a low level" was not satisfied because multiple drainages in the Project area already have an open road density that exceeds the threshold identified in the Coordinating Elk and Timber Management Report. (Doc. 16 at 31). The report clarifies that "low levels" of open roads are found where there is "less than one-half mile of road per square mile." (FS055768).

In support of their arguments, Plaintiffs cite to *Alliance for the Wild Rockies v. Marten.* 585 F. Supp. 3d 1252. That case involved a different forest standard that also referred to the Coordinating Elk and Timber Management Report. However, in contrast to the facts of this case, the forest plan in *Marten* required that the terms of the report be implemented. That Court also addressed the agency's interpretation of the "low level" definition from the report. Because the record provided no other definition for "low level," the court determined that the one-half mile limit from the report was the applicable standard. *Alliance for the Wild Rockies v. Marten,* 585 F. Supp. 3d at 1272.

In response, Defendants make two primary arguments. First, they reference multiple instances in the record where USFS allegedly considered the contents of the report and road density. Many of these references address instances where the agency considered not only Standard F.1.e.13, but the now-amended F.1.e.14. Although F.1.e.14 was repealed by amendment, Defendants indicate that because it addressed road density, the agency's consideration of that standard is relevant in determining substantive compliance with F.1.e.13.

Second, Federal Defendants argue that "low level" in this context should be interpreted as requiring "1 or 2 miles of open road per square mile." (Doc. 22 at 35) (citing FS00921, FS020762). That definition is taken from language in F.1.e.14. Defendants base this argument on their interpretation of *Marten*, and that

45

court's determination that the agency was required to use the "low level" definition from the Coordinating Elk and Timber Management Report because the record provided no alternate definition. Here, Defendants argue, the record does contain an alternate definition, found in F.1.e.14. Accordingly, Defendants insist that the agency's definition of "low level" should control.

In their reply, Plaintiffs insist that Defendants "impermissibly conflate" Standards F.1.e.13 and F.1.e.14. Plaintiffs further insist that "the Forest Plan ROD requires actual 'incorporation' into project planning, i.e. meaningful discussions about each of these recommendations in the discussions of actions and effects in the Project EIS". (Doc. 32 at 19). Accordingly, Plaintiffs argue, the portions of the record cited by Defendants fail to show satisfactory incorporation of the Coordinating Elk and Timber Management Report.

Defendants' interpretation of what Standard F.1.e.13 requires is due substantial deference under Ninth Circuit caselaw. *Oregon Natural Desert Ass'n,* 957 F.3d 1024, 1035 (9th Cir. 2020); *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1056 (9th Cir. 2012). Considering the various portions of the record highlighted in Defendants' briefing, the Court finds that USFS adequately considered the recommendations from the Coordinating Elk and Timber Management Report. Although Plaintiffs might reasonably desire greater detail in

the agency's analysis or seek a stricter adherence to the report's recommendations, the language of F.1.e.13 requires neither.

### e.      HFRA Section 6591a

Plaintiffs next challenge the Project's substantive compliance with two requirements of HFRA. First, Plaintiffs proffer that because the Project does not comply with Forest Plan standards, it therefore violates HFRA. Second, Plaintiffs argue that the Project violates HFRA's mandate to maximize the retention of old growth and large trees. The Court will address each argument in turn.

### 1.      Compliance with Forest Plan Standards

HFRA authorizes the treatment of Federal lands "to reduce the risk or extent of, or increase the resilience to, insect or disease infestation" or "to reduce hazardous fuels." 16 U.S.C. § 6591a(d)(1)(A), (B). Such projects must be "conducted consistent with the resource management plan and other relevant administrative policies or decisions applicable to the Federal land covered by the project." 16 U.S.C §6512(b).

In light of these requirements, Plaintiffs argue that the Project violates the requirements of the Forest Plan and therefore violates the HFRA requirements set forth in 16 U.S.C §6512(b). Plaintiffs refer to the various portions of their briefing that address substantive compliance with the Forest Plan. However, as addressed

above, the Court finds no violations of NFMA or the Forest Plan. Accordingly, Plaintiffs have not demonstrated a violation of 16 U.S.C §6512(b).

### 2.      Retention of Old Growth and Large Trees

HFRA further requires that authorized hazardous fuel reduction projects shall be carried out "in a manner that maximizes the retention of old-growth and large trees, as appropriate for the forest type, to the extent that the trees promote stands that are resilient to insects and disease." 16 U.S.C. § 6591a(e). Plaintiffs allege two violations of this statutory requirement. First, Plaintiffs argue that "the Project allows 567 acres of old growth logging," in violation of § 6591a(e). Second, Plaintiffs argue that USFS "refused to use the more protective Forest Plan definition of old growth for the Project and instead used a less protective definition." (Doc. 16 at 33).

Defendants contend that while the Project does authorize "intermediate harvest" within old growth, these actions do not violate HFRA and will provide benefits to forest health. Defendants cite to the Project Record of Decision, which addresses compliance with HFRA and the need to "maximize the retention of old-growth and large trees." (FS011289). Specifically, Defendants highlight the passages within this section of the Record of Decision that address the results of "variable density thinning." (Doc. 22 at 37). The Record of Decisions indicates that

variable density thinning "results in an open canopy comprised of the healthiest, largest trees." (FS011289). Further, the Record of Decision indicates that

> [t]hinning stands reduces damage from western spruce budworm by reducing the number of canopy layers . . . . Thinning reduces competition for water and nutrients resulting in vigorous fast growing leave trees that are not favorable habitat for budworm.

(FS011289).

On reply, Plaintiffs do not address their HFRA claims or Defendants' responses to the HFRA arguments raised in Plaintiffs' opening brief. Therefore, the Court is left to determine whether USFS complied with HFRA based on the arguments supporting the parties' opening briefs and Defendants' combined reply and response brief.

In support of their arguments, Defendants cite to *Alliance for the Wild Rockies v. Marten*. 464 F. Supp. 3d 1169, 1176 (D. Mont. 2020). Considering the same statutory requirements, the court in that case held that "[t]his language vests the Forest Service with considerable discretion to weigh various factors, including the characteristics of the project area and risks of insects and disease, when identifying old-growth and large trees." *All. for the Wild Rockies v. Marten*, 464 F. Supp. 3d 1169, 1176 (D. Mont. 2020). Defendants are afforded the same discretion in this instance. In light of that discretion, the Record of Decision sufficiently explains the Project's compliance with 16 U.S.C. § 6591a(e). Plaintiffs have accordingly failed to establish a violation of HFRA.

**f.    Supplemental EIS**

Plaintiffs' final line of argument concerns the need for a supplemental EIS. Plaintiffs allege that significant new information regarding grizzly bears and wolverine has come to light since the Record of Decision was signed. This new information, Plaintiffs proffer, indicates that the Project's effects on both species "may differ from the impacts analyzed in the EIS." (Doc. 16 at 35). Plaintiffs argue that this new information and the potentially unaddressed impacts must be addressed in a supplemental EIS.

Public process is at the heart of NEPA, and it ensures public notice and involvement as well as assures the public that the agency has considered environmental issues and public input in the decision-making process. *Oregon Natural Res. Council v. Devlin*, 776 F.Supp. 1440, 1446 (D. Or. 1991) (citations omitted). "However, the public comment process is not essential every time new information comes to light after a NEPA document is prepared." *Devlin*, 776 F.Supp. at 1446. "Not every new circumstance requires filing a new supplemental environmental impact statement or assessment or reopening a prior decision. An agency may evaluate new information in a supplemental report, without reopening the environmental assessment process for the project at issue." *Devlin*, 776 F.Supp. at 1449 (citing *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360 (1989)).

*Marsh* requires agencies to apply the "rule of reason," which justifies reopening the NEPA process when there "are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." *Marsh*, 490 U.S. at 372. The "significant" new circumstances or information "must present a *seriously* different picture of the environmental impact of the proposed project from what was previously envisioned." *Devlin*, 776 F.Supp. at 1449 (emphasis in original).

Regarding both wolverine and grizzly bear, Defendants argue that a supplemental EIS is not necessary because the relevant new information regarding both species was addressed in a December 2024 Supplemental Information Report ("SIR"), where USFS "reasonably determined that supplemental NEPA was not required." (Doc. 22 at 39). The parties disagree as to the effect and impact of the SIR.

Plaintiffs argue that despite the SIR, a supplemental EIS is still required. However, Plaintiffs do not address the contents of the SIR. Instead, they state that the SIR "is a non-NEPA, internal agency memo that is not circulated for public comment" and argue that "courts give no deference to conclusions in a Forest Service Supplemental Information Report . . . instead, a reviewing court must make its own determination whether supplementation of an EIS is warranted. (Doc. 32 at 20). To substantiate these assertions, Plaintiffs cite to the following federal

51

cases where the court "rejected SIR conclusions" (Doc. 32 at 20) and remanded for

further NEPA analysis: *Native Ecosystems Council v. Tidwell*, 599 F.3d 926, 937

(9th Cir. 2010); *All. for the Wild Rockies v. Probert*, 412 F.Supp.3d 1188, 1207 (D.

Mont. 2019); *Sierra Club v. Bosworth*, 2005 WL 3096149, at \*6 (N.D. Cal. 2005);

*Cascadia Wildlands v. USFS,* 2021 WL 61`12546, at \*5 (D. Or. 2021); and

*Wildlands v. USFS*, 791 F. Supp. 2d 979, 991 (D. Or. 2011).

As Defendants point out, it is well-established that an agency may use an

SIR to determine whether new information triggers the need for supplemental

NEPA analysis. "An agency may evaluate new information in a supplemental

report, without reopening the environmental assessment process for the project at

issue." *Devlin*, 776 F.Supp. at 1449, citing *Marsh v. Oregon Natural Res. Council*,

490 U.S. 360 (1989). In all five cases cited by Plaintiffs, the Court rejected the SIR

based on some apparent deficiency. While Plaintiffs have successfully highlighted

the reality that producing an SIR does not always obviate the need for further

analysis, the weight of precedent demonstrates that whether or not supplemental

NEPA analysis is required will depend on the facts of the case and the contents of

the SIR.

Because Plaintiffs do not address the content and conclusions in the SIR, the

Court is left to determine whether Plaintiffs' opening brief raises any issues related

to grizzly bear and wolverine that are not sufficiently addressed in the SIR. The Court will address each species in turn.

### 1.    Grizzly Bear

As Plaintiffs point out, the Project Record of Decision indicates that "[t]he selected alternative would have no effect to grizzly bear because the entire project area is outside the latest map of areas where USFWS has determined grizzly bear may be present." (FS011306). Given that determination, Plaintiffs highlight three interrelated pieces of information that they claim collectively necessitate the preparation of a supplemental EIS.

First, Plaintiffs cite to a local newspaper report indicating three grizzly bears were present in the Sapphire Mountains in August, 2023. (FS084870). Second, Plaintiffs highlight U.S. Fish and Wildlife Service's updated determination regarding grizzly bears' presence in the Project area. While the prior determination (as referenced in the Record of Decision) indicated that grizzly bear were not present, the U.S. Fish and Wildlife Service updated the "may be present" map in September 2023. Portions of the Project area now overlap with areas where the Fish and Wildlife Service determined grizzly bears may be present. (FS023118).

Third, Plaintiffs highlight the conclusions found in the March 2024 Supplemental Biological Assessment for Grizzly Bear. (FS023094). There, USFS identified the potential for direct, indirect, and cumulative effects on grizzly bear.

Considering this information together, Plaintiffs argue a supplemental EIS is necessary to inform the public and fulfill NEPA requirements for the Project.

Defendants argue that, as documented in the SIR, USFS reasonably determined that new information regarding "transient grizzly bears" and the contents of the Supplemental Biological Assessment did not necessitate further NEPA analysis. As Defendants note, the SIR includes and incorporates the Supplemental Biological Assessment for Grizzly Bear and an April 2024 letter of concurrence from the U.S. Fish and Wildlife Service for grizzly bear. (FS084884-960; FS085030-34).

In explaining why further NEPA analysis is not necessary, the SIR details some of the administrative history involving grizzly bear and the project. The SIR notes that the Project May 2019 Wildlife Specialist Report "analyzed the effects of the project on grizzly bear" and determined that "any use of the project area by grizzlies 'would probably be transient bears' but that it was 'highly likely that grizzlies do not currently occupy the project area.'" (FS084882).

However, the 2023 Wildlife Analysis Report changed "the determination of project effects for purposes of the Endangered Species Act from 'may affect, not likely to adversely affect' to 'no effect,' due to changes in the 'may be present' map published by the U.S. Fish and Wildlife Service." (FS084882). Otherwise, according to the SIR, the 2023 Wildlife Analysis Report "explained that no

54

updated to the grizzly bear analysis were made during the preparation of the Supplemental EIS." (FS084882). Because the analysis remained the same, the SIR states that "[t]he May 2019 Wildlife Specialist Report therefore remains the operative analysis of project effects on grizzly bears under NEPA." (FS084882)

In light of this timeline, the SIR explains USFS' rational for concluding that the contents of the 2024 Supplemental Biological Assessment were consistent with the Project NEPA analysis:

> As explained above, my decision to authorize the project in the August 2023 ROD relied on the grizzly bear analysis conducted in the October 2019 Final EIS and May 2019 Wildlife Specialist Report . . . and subsequent updates and addendums to this report. This analysis assumed that transient grizzly bears may be present in the project at any time. This information is consistent with the information discussed in the 2024 updated Biological Assessment for the project.

(FS084882). In effect, the SIR states that the Record of Decision relied on the conclusion that transient grizzly bears may be present in the Project area. However, the Record of Decision indicates otherwise:

> The selected alternative would have no effect on grizzly bear because the entire project area is outside the latest map of areas where USFWS has determined grizzly bear may be present.

(FS011306). This same conclusion—that grizzly bear are not present and therefore will not be affected by the Project—is repeated in Appendix C to the Record of Decision:

At this time, US Fish and Wildlife Service does not consider that the threatened grizzly bear "may be present" in the Gold Butterfly project area. Therefore, the project would have "no effect" to grizzly bear.

(FS011337).

Given the content of these passages, it appears that, on its face, the SIR misrepresents the conclusions and analysis underlying of the Record of Decision. The SIR arrives at the conclusion that further NEPA analysis is not necessary. However, that conclusion is based, at least in part, on inaccurate or contradictory recitation of the contents of the record. Accordingly, the SIR, as currently drafted, cannot sustain Defendant's arguments that no further NEPA analysis is required.

This is not to say that the Court endorses all of Plaintiffs' assertions regarding the need for a supplemental EIS. The Court merely finds that the SIR contains an obvious inaccuracy that speaks to the heart of the issue. Defendants' determination that supplemental NEPA analysis was not necessary was premised on apparently inaccurate information. Accordingly, the decision not to engage in additional NEPA analysis was arbitrary and capricious.

### 2. Wolverine

Regarding wolverine, Plaintiffs argue that a supplemental EIS is required to address the presence of a reproducing, female wolverine in or around the Project area. Plaintiffs point to an August 2023 wolverine monitoring report, included in the administrative record. (FS084854). That report indicates that a lactating female

56

wolverine was detected at a monitoring station that "appears to be within the [Project] area." (Doc. 16 at 38) (citing FS084850). Plaintiffs indicate this information is especially significant because this was the only reproducing female wolverine detected in 2023 across four National Forests. (Doc. 16 at 39) (citing FS084846-69). Plaintiffs argue that, given the recent listing of wolverine as a threatened species under the Endangered Species Act, this monitoring data is significant new information, meriting a supplemental EIS.

As with grizzly bear, Defendants argue that the SIR adequately considered the new information and reasonably concluded that further NEPA analysis was not warranted. Specifically, the SIR indicates that impacts to maternal denning habitat were considered in the Project's 2023 Wildlife Report. (FS084881). The SIR concludes that the impacts discussed in the Wildlife Report are consistent with the data indicating the presence of a lactating wolverine in or near the Project area. (FS084881)

Unlike the SIR analysis concerning grizzly bear, the Court finds no deficiency with the SIR analysis concerning wolverine. Because Plaintiffs have not addressed the contents of the SIR, the Court must defer to the agency's conclusion that the analysis in the 2023 Wildlife Report adequately considered project impacts on reproducing females. Accordingly, Plaintiffs' arguments on this issue fail.

## V.    Remedy

Plaintiffs request that the Court "either vacate the Gold Butterfly Project decision or enjoin the Gold Butterfly Project, and remand to the agency for further analysis. (Doc. 16 at 40). Defendants do not address the specifics involved in determining a remedy, but request additional briefing on the issue. (Doc. 22 at 43 n. 4)

Vacatur typically accompanies a remand under the APA. *Alliance for the Wild Rockies*, 907 F.3d at 1121. However, where an agency's error "is limited in scope and severity, and vacatur would result in a disproportionate disruption to the [p]roject," remand without vacatur may be warranted. *All. for the Wild Rockies v. Savage*, 375 F. Supp. 3d 1152, 1156 (D. Mont. 2019). A court "is not required to set aside every unlawful agency action" even though it has the power to do so. *Nat'l Wildlife Fed'n v. Espy*, 45 F.3d 1337, 1343 (9th Cir. 1995) (citation omitted).

Considering the limited scope of the errors above, the Court finds that vacatur is not necessary. It is possible that the agency may be able to resolve the errors that the Court has noted with minimal delay and disruption to the Project. Accordingly, the Court declines the request for supplemental briefing, and orders that the Project be enjoined and remanded to the USFS for further review.

## VI.    Conclusion

For the reasons set forth above and consistent with that analysis,

58

IT IS ORDERED that Defendants' motion to complete the administrative record (Doc. 26) is GRANTED in part and DENIED in part as follows:

1.    Defendants' request is DENIED to the extent that it seeks to admit the documents identified as FS085194-95; FS085196-204; and FS085343.

2.    Defendants' request is GRANTED as to the remaining documents.

IT IS ORDERED that the parties' cross-motions for summary judgment (Docs. 15, 21) are GRANTED in part and DENIED in part as follows:

1.    Plaintiffs are entitled to summary judgment on their NEPA claim regarding grizzly bear.

2.    Defendants are entitled to summary judgment on all other claims.

IT IS FURTHER ORDERED that Federal Defendants are ENJOINED from implementing the Project and this matter is REMANDED to Federal Defendants to address the deficiencies identified in this Order.

DATED this 31st day of March, 2026.

_____
Kathleen L. DeSoto
United States Magistrate Judge